UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EVANTHIA C. ARETAKIS and | ) | |
| CHARLES F. SVIRK, JR., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 05-10257-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| INRANGE TECHNOLOGIES CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

This matter stems from a dispute regarding the terms of Evanthia C. Aretakis'
employment with General Signal Networks ("GSN"), a predecessor of Defendant Inrange
Technologies.  In early 1997, GSN recruited Aretakis to work for the company as general
manager of one of its business units.  At the time, GSN was a subsidiary of General Signal
Corporation ("General Signal"), and was planning a "spin-off" from General Signal and an initial
public offering ("IPO").  Robert Coackley, who was GSN's then-president, told Aretakis during
the recruitment process that GSN and General Signal expected to complete the spin-off during
summer 1997 and that Aretakis' position would entitle her to equity in the new company.

In June 1997, GSN presented Aretakis with a written offer of employment which
included a lucrative salary, bonus opportunities, stock options in its parent company, General
Signal, and a $40,000 signing bonus.  After further negotiation to address additional issues raised
by Aretakis, including relocation benefits and additional vacation, GSN prepared an addendum
to that offer.  GSN explicitly told Aretakis that it was not including the promise of equity in the

"spun-off" entity as part of the written agreement. Aretakis nevertheless signed the contract and joined GSN.

After Aretakis joined GSN, the company continued to work towards the spin-off and IPO, and continued to assure Aretakis that she would receive stock option equity after the spin-off was achieved. However, after encountering various delays, General Signal and GSN decided to forego the spin-off in July 1998 and announced plans to sell GSN to SPX Corporation. Aretakis voluntarily resigned just before the public announcement of the sale.

Plaintiffs assert that because the spin-off never occurred and Aretakis never received the promised equity, they are now entitled to damages. For the reasons set forth below, all of Plaintiffs' claims fail as a matter of law. In particular:

1.    Plaintiffs' claim of breach of contract should be dismissed because (a) the written employment agreement Aretakis signed supersedes any prior oral agreements about potential stock options or equity, and (b) Aretakis was an "at-will" employee and had no right to continued employment sufficient for any options to vest.

2.    Plaintiffs' claim of promissory estoppel fails because any reliance on statements about equity in a potential spin-off made to Aretakis before she was hired was unreasonable as a matter of law where Aretakis' written employment agreement did not include those statements.

3.    Plaintiffs' claim of Deceptive Practices under Chapter 93A of the Massachusetts General Law is not actionable because it arises from an employment relationship, not a commercial transaction.

4.    Plaintiffs' claim of fraud should be dismissed because there is no evidence that any statements were made to Aretakis with the intent to defraud, and because any reliance on such statements was unreasonable.

2699753.6                                        2

## STATEMENT OF UNDISPUTED FACTS

### A.     Procedural History

On March 11, 1999, Plaintiffs filed this matter in the United States District Court, Southern District of New York.  On October 22, 1999, the Honorable Alvin K. Hellerstein dismissed the action without prejudice, and tolled the statute of limitations indefinitely.  Almost five years later, on July 14, 2004, Plaintiffs refiled their lawsuit in the Commonwealth of Massachusetts, but did not effect service on the defendants until January 11, 2005.[1]  In February 2005, the action was removed to this court.

### B.     The Parties

#### 1.     Plaintiffs Aretakis and Svirk

Plaintiffs are husband and wife and have been married since 1988.  (Aretakis Dep. 154:20, Sept. 23, 2005.)[2]  Aretakis began her professional career in 1981 and worked for various companies in Texas, Massachusetts, and New York before eventually accepting a position with Siemens Corporation in Boca Raton, Florida in 1988.  (Aretakis Dep. 9-11.)  Siemens initially employed Aretakis as a product line manager in charge of sales support.  (Aretakis Dep. 11:13-14.)  She was later promoted to vice president of a business unit that provided telecommunications services to telephone companies.  She voluntarily resigned from that position in 1997 to join GSN.  (Aretakis Dep. 11:15-19.)

In July 1997, GSN hired Aretakis as general manager of its "Tautron" business unit in Westford, Massachusetts.  (Compl. ¶¶ 16, 18.)  Aretakis resigned from that position in July 1998.  (Compl. ¶ 35; Aretakis Dep. 22.)  Her claims in this matter arose during this 1997-1998 period.

---

[1] In addition to Inrange Technologies, there were several other defendants named in the lawsuit when it was filed in July 2004, including General Signal, GSN, SPX Corporation, and Robert Coackley.  Each of those other defendants has subsequently been dismissed voluntarily by Plaintiffs.

[2] Supporting deposition testimony and exhibits are attached as Exh. A to the accompanying Affidavit of Jonathon T. Naples.

After her resignation from GSN, Aretakis moved back to Florida and rejoined Siemens. In 2000, she returned to Massachusetts as general manager of a business unit owned by Siemens in the area. (Aretakis Dep. 23.) In 2002, Siemens promoted Aretakis to CEO and president of Siemens Network Convergence based in Chelmsford, Massachusetts – a position she currently holds. (Aretakis Dep. 24-25.)

### 2.    Defendants

In 1997-1998, GSN was a wholly-owned subsidiary of General Signal Holdings Company, which in turn was a wholly-owned subsidiary of General Signal Corporation. Aretakis was an employee of GSN, which manufactured a variety of products for data and telecommunications networks, including high-speed switching systems, testing, monitoring and management systems, and data center connectivity systems.

On July 17, 1998, just before Aretakis resigned from the company, GSN changed its name to Inrange Technologies Corporation. On October 6, 1998, SPX Corporation acquired General Signal and its subsidiary, Inrange. On September 21, 2000, Inrange executed an IPO. Inrange was subsequently purchased by Computer Network Technology, which in turn was purchased by McDATA Corporation.

### C.    Pre-Hire Activity: December 1996 – July 1997

### 1.    Initial Discussions

Aretakis first learned of the opportunity at GSN in December 1996. A recruiter from the recruiting firm of Christian & Timbers contacted Aretakis and told her that GSN was looking for a general manager for its Tautron business unit. (Compl. ¶ 16; Aretakis Dep. 25-26.) The pre-hire discussions with the search firm progressed, and Aretakis began corresponding directly with

Coackley, then-president of GSN, and William vonReichbauer, vice-president of Human Resources.  (Aretakis Dep. 28:3-17.)

### 2.    Pre-Hire Discussions With Robert Coackley

Over the course of several conversations, Coackley and Aretakis discussed the opportunity at GSN, the planned spin-off, and the potential for equity in the new company. (Aretakis Dep. 29:10-24; 30:1-19.)  In early 1997, Coackley told Aretakis that he expected that the business unit would be spun-off before the end of the summer of 1997.  (Aretakis Dep. 29:17-24; 30:1-7.)  While Coackley cautioned Aretakis that there was some risk that the spin-off might not occur, he told her that "he believed this was far less risky than joining a startup." (Aretakis Dep. 40:17-18.)

Aretakis understood that she would acquire equity in the new company only after the spin-off was complete, and that the process was complex because it involved participation and cooperation by Tautron, GSN, General Signal, and the General Signal board of directors. (Aretakis Dep. 41:7-16; 43:6-10.)  Aretakis understood that the spin-off would be a two-part process: first, General Signal would divest itself of its subsidiary GSN, and second, GSN would file for and complete an IPO.  (Aretakis Dep. 41:10-24.)

Coackley told Aretakis that he anticipated that five percent (5%) of the equity in the newly spun-off company would be divided among the eight senior officers, which would result in a grant of roughly 125,000 shares to each of the eight.  (Aretakis Dep. 35:18-22.)  Coackley explained that this equity would take the form of stock options "[t]hat would vest over a four-year period from the inception of the spin-off."  (Aretakis Dep. 35:22-24; 36:13-16.)  Coackley told Aretakis that the share price after the IPO was issued might be roughly $20, and that the price at which the eight officers would be permitted to purchase shares would be "someplace in

the neighborhood of $10 or so." (Aretakis Dep. 42:7-11.) Aretakis understood that Coackley's valuation was merely an estimate based on the business unit's current revenue and profitability. (Aretakis Dep. 42:16-24; 43:1-5.)

Aretakis also understood that the parent company, General Signal, and its board of directors would play a role in setting the IPO share price. (Aretakis Dep. 41:7-16; 43:6-10.) Other than her conversations with Coackley and vonReichbauer, she did not inquire further about the spin-off with anyone else who was affiliated with GSN or General Signal. In particular, she failed to raise the issue with Mike Lockhart, CEO of General Signal, during an interview with him. (Aretakis Dep. 58:12-15.)

### 3.    GSN's Written Employment Offer

Following months of negotiations, GSN presented Aretakis with a written offer of employment on June 6, 1997. (See Affidavit of Jonathon T. Naples, hereafter "Naples Aff." Ex. B; Aretakis Dep. 59:9-21.) The offer contemplated that GSN would pay Aretakis $175,000 annually, and that she would receive a hiring bonus of $40,000. (Aretakis Dep. 59:22-24; 60:1; 61:21.) The offer also contained two additional bonus opportunities: twenty-five percent (25%) of Aretakis' base salary if GSN met its performance targets, and an incentive bonus based on operating income for the Tautron unit. (Aretakis Dep. 61:24; 62:1-6.) The offer also included 1,000 stock options in GSN's parent company, General Signal, eligibility for the GSN long-term incentive program, and other benefits. (Aretakis Dep. 62:11-24; 63:1-10.)

After considering the June 6 offer, Aretakis spoke with vonReichbauer to negotiate some additional points. (Aretakis Dep. 18-24; 65:1-3.) As a result of these negotiations, GSN issued an addendum to the June 6 offer. (Aretakis Dep. 65:4-7; see also Naples Aff. Ex. C.) The

addendum included a $10,000 relocation allowance and additional vacation eligibility.  (Aretakis Dep. 65:8-18.)

There was no mention in the June 6 offer or the subsequent addendum of any stock options or equity in a potential spin-off of GSN.   In fact, Aretakis understood that equity in GSN was *not* included as part of either the June 6 offer or the addendum.  (Aretakis Dep. 64:3-6; 65:19-21.)  "Coackley made it very clear that that was not something that he could put in writing in the offer letter . . . [he stated that] legally he couldn't do it."  (Aretakis Dep. 64:6-12.)  Coackley's statement was confirmed by vonReichbauer, who told Aretakis that "they weren't allowed to do that."  (Aretakis Dep. 64:13-15.)

The June 6 offer also included a paragraph that stated:  "You or the Company may terminate your employment, with or without cause at any time."  (Aretakis Dep. 63:11-15.)  Aretakis understood that the offer was for "at-will" employment.  (Aretakis Dep. 63:17-20.)

### 4.    Aretakis' Acceptance of GSN's Offer

With the knowledge that (1) the potential stock options/equity compensation was not included as part of the offer, and (2) she was joining GSN as an at-will employee, Aretakis signed the offer on June 12, 1997.   (See Naples Aff. Ex. B; Aretakis Dep. 63:24-64:1-2.)  Aretakis testified that other than this signed document and the addendum, there was nothing else that she received from Coackley, vonReichbauer, or GSN setting forth the terms of her employment.  (Aretakis Dep. 66:11-18.)

Aretakis began her employment with GSN in July 1997.  (Compl. ¶¶ 18-19.)  Throughout her tenure, GSN actively worked towards the spin-off and remained committed to offering Aretakis an "equity" position after the process was completed.  As an officer in GSN, Aretakis was intimately involved in the preparatory work.  For example, the 1998 budget, which Aretakis

helped prepare, included costs related to the spin-off and confirmed that GSN was working towards that goal. (Compl. ¶ 19.) Similarly, the "1998 Corporate Vision," prepared in December 1997, confirmed that GSN was working towards the spin-off (Compl. ¶ 21) and an article about the impending spin-off appeared in a local business journal on December, 19, 1997. (Naples Aff. Ex. G.)

Throughout January and February 1998, Coackley met with members of General Signal and the GSN management team preparing for the spin-off. (Compl. ¶ 22; Naples Aff. Ex. E.) In February 1998, GSN received a favorable ruling from the Internal Revenue Service on its application. (Compl. ¶ 24.) Aretakis submitted one of the letters in support which was filed with the IRS. (Naples Aff. Ex. D.) GSN also filed its General Registration (Form 10) with the Securities and Exchange Commission ("SEC") on May 13, 1998. (See Naples Aff. Ex. F.) As the process continued to move forward, Coackley reaffirmed that Aretakis would receive an equity interest once the spin-off was completed. (Compl. ¶ 27.)

Although GSN and General Signal intended to implement the spin-off in summer 1997, business concerns arose which caused the process to be pushed back. GSN encountered delays preparing certain documents that had to be filed with the SEC as part of the spin-off process. (Compl. ¶ 20.) In January 1998, the discovery of significant issues related to debt and option reserves further slowed the process. (Compl. ¶ 22.) In May 1998, corporate officials decided that "[p]rior to [the] spin, it was critical that quarter over quarter showed a gain for the new unit." (Compl. ¶ 29.) As a result, the spin-off was further delayed so that second quarter financial statements would be available. (Compl. ¶¶ 29, 31; see also Naples Aff., Ex. J.)

In July 1998, General Signal received an offer from SPX to sell its GSN subsidiary, and all plans for the spin-off were put on hold. (Compl. ¶ 36.) Aretakis voluntarily resigned a few

days prior to the public announcement of the sale to SPX.  (Aretakis Dep. 137:6-17.)  At about

the same time, GSN changed its name to Inrange Technologies Corporation.  On September 21,

2000, Inrange finally completed its IPO.

## LEGAL ANALYSIS AND ARGUMENT

### A.    Breach Of Contract

Plaintiff's breach of contract claim alleges that an oral contract as to her eligibility for

stock options in the new spin-off company arose from her negotiations with Coackley prior to

her signing the employment contract with GSN.  However, her employment contract was a fully

integrated, final expression of the parties' agreement, thus barring *any* prior oral or

contemporaneous agreements that serve to vary the terms of the written agreement.

### 1.    Applicable Law

"Under Massachusetts law, interpretation of a contract is ordinarily a question of law for

the court."  Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st Cir. 1992)

(quoting Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1981). "Only if the contract is

ambiguous is there an issue of fact for the jury." Id. (citing cases).

"Evidence of prior or contemporaneous oral agreements cannot be admitted to *vary* or

*modify* the terms of an unambiguous written contract."  Id. (emphasis in original) (citing New

England Financial Resources, Inc. v. Coulouras, 30 Mass. App. Ct. 140, 145, 566 N.E.2d 1136,

1139 (1991) (parol evidence rule precludes use of oral evidence to modify an integrated

agreement).  Moreover, "parol evidence may not be used to 'create ambiguity where none

otherwise exists.'"  Rey v. Lafferty, 990 F.2d 1379, 1385 (1st Cir. 1993) (quoting Boston Car

Co. v. Acura Auto. Div., 971 F.2d 811, 815 (1st Cir. 1992)).  Instead, "parties are bound by the

plain terms of their contract,"  Hiller v. Submarine Signal Co., 325 Mass. 546, 550, 91 N.E.2d

667, 669 (1950), and their subjective contemplations are immaterial where the agreement is unambiguous. Blakeley v. Pilgrim Packing Co., 4 Mass. App. Ct. 19, 24, 340 N.E.2d 511, 514 (1976).

An integrated agreement is a writing that is complete and specific: "Where the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression." Id.; see also Ryder v. Williams, 29 Mass. App. Ct. 146, 149, 558 N.E.2d 1134, 1136 (1990).

### 2.    Parol Evidence Cannot Modify The Terms of a Written Contract

Plaintiffs rely entirely on promises allegedly made *before* Aretakis signed the GSN employment contract to support their claim that an enforceable oral contract exists. However, evidence of prior oral agreements cannot be admitted to vary or modify the terms of a written contract. Fairfield, 970 F.2d at 993. As a result, Plaintiffs' claim fails as a matter of law.

Aretakis' employment contract constitutes a completely integrated document. The contract specifically and unambiguously details all aspects of Aretakis' employment, including her compensation, bonuses, and participation in the General Signal stock option plan. There is nothing in the contract to suggest that the parties did not intend it to be a complete and final expression of their rights and obligations. The fact that negotiations occurred both before and after Aretakis was presented with the original written offer, and that GSN added an addendum to address several of Aretakis' specific concerns, further supports a finding that the written contract alone reflects the parties' agreement regarding the terms and conditions of her employment.

Because neither Aretakis' employment agreement nor its addendum includes a promise of equity in the spun-off company, her claim that an oral contract was created prior to the signing of that agreement fails as a matter of law.

**3.    Aretakis' Claim Fails Because She Was An At-Will Employee**

It is undisputed that Aretakis was an at-will employee who could be discharged at any time.  Even under the most optimum conditions, her right to equity in a spin-off company would not have begun to vest until she had been employed for at least one year.  Any such promise of equity, therefore, was in conflict with and superseded by the at-will provision in her employment agreement.

A recent decision of the Massachusetts Supreme Court is directly on point.  In <u>Montlouis v. Pirus Networks, Inc.</u>, 2005 WL 1009523 (Mass. Mar. 15, 2005); Naples Aff., Ex. H, Montlouis was recruited to join the defendant, a start-up company.  During the interview process, he was told that the start-up was going to proceed to an initial public offering.  Furthermore, Montlouis was assured that he would be employed by the defendant for at least four years, and would receive equity in the company under its Stock Option Plan.  Following the interview, Montlouis was presented with an employment contract.  The contract expressly stated that his employment would be at-will and did not contain the promise of four years of employment.  Montlouis signed the contract.

Montlouis was subsequently discharged and brought suit claiming breach of contract because he did not receive the equity promised in his written employment agreement.  The court rejected his claim:

> [e]ven if [defendant] indeed told Montlouis before he accepted Pirus's offer of employment that he would be employed by Pirus for at least four years and would receive equity in Pirus under its 2000 Stock Option Plan, which provided for a four-year vesting period for those options, these oral statements, even if they were

> understood by Montlouis to be promises rather than predictions, were superseded by the written employment agreement and the Stock Option Plan, would [sic] made explicit that Pirus was making no promise of continued employment. Moreover, any oral promise of employment for a four-year period would be unenforceable because of the statute of frauds.

Montlouis at *9 (citing Mass. Gen. Laws ch. 259, § 1); Powers v. Boston Cooper Corp., 926 F.2d 109, 110 (1st Cir. 1991).

The facts of Montlouis are directly analogous to Aretakis' situation. Her employment was also at-will. She claims that she was promised equity in the new company prior to signing her employment contract, and that the options were to vest over a four-year period beginning one year *after* the spin-off was finalized.[3] In order for her options to vest, therefore, Aretakis must demonstrate that she was promised employment for, at the very least, up to one year following the spin-off. Just as in Montlouis, such a claim is superseded by Aretakis' employment agreement, which makes no promise of continued employment. Her claim fails as a matter of law.

### 4.    The Statute of Frauds Bars Aretakis' Claim

Plaintiffs' oral contract claim also fails because of the statute of frauds. To demonstrate that they are entitled to damages related to the stock options at issue, Plaintiffs must also show that GSN agreed to employ Aretakis for a term *greater* than one year. Under Massachusetts law, a promise of employment for more than one year is unenforceable without a signed memorandum. Powers, 926 F.2d at 110; see also G.L.c. 259, § 1. Aretakis' claim for options is therefore unenforceable.

In sum, Plaintiffs' claim that oral promises created a contractual right to stock option equity fails for three reasons. First, the written offer letter was a fully integrated agreement

---

[3] Aretakis understood this vesting requirement to mean that she would be eligible to exercise twenty-five percent (25%) of her options in the first year following the spin-off, and twenty-five percent (25%) in each of the subsequent three years.

which superseded the prior oral negotiations.  Second, Aretakis was an "at-will" employee.
Even if the proposed spin-off had occurred, and even if Aretakis held a valid contractual right to
stock options, she would not have a claim because the company could have terminated her at any
time.  Third, any such oral contract is unenforceable under the statute of frauds.  Therefore,
summary judgment in favor of Defendant is appropriate.

### 5.    Failure of Condition Precedent

It is undisputed that Coackley's statements regarding the spin-off and IPO were not
memorialized as part of Aretakis' employment agreement with GSN.  That being said, even if
this court assumes the existence of a valid oral agreement, Plaintiffs' breach of contract claim
and their promissory estoppel claim fail as a matter of law because the IPO was a condition
precedent to GSN's obligations and the IPO never occurred.

"A condition precedent defines an event which must occur before a contract becomes
effective or before an obligation to perform arises under the contract.  If the condition is not
fulfilled, the contract, or the obligations attached to the condition, may not be enforced."  Twin
Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 1132 (Mass. 2005)
(quoting Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 577 N.E.2d 283, 288 (Mass.
1991)).

All of Plaintiffs' claims in this matter are premised on Aretakis' belief that an oral
agreement was consummated obligating GSN to offer her stock options in the company after it
went public.  The spin-off and subsequent IPO were both "conditions precedent" to GSN's (and
now Defendant's) obligations tied to the oral agreement.  See Twin Fires, 837 N.E.2d at 1133
(IPO was condition precedent to defendant's obligation to sell plaintiff IPO shares).  Aretakis
understood that she would receive these stock options if, *and only if*, the spin-off and subsequent

IPO materialized.  During all times relevant to this matter neither condition ever materialized. As a result, Plaintiffs have no right to enforce the oral agreement and their argument otherwise fails as a matter of law.

**B.    Promissory Estoppel**

Like her oral contract claim, Plaintiffs' promissory estoppel claim rests on alleged promises made by Coakley prior to Aretakis' signing of the employment contract.  However, Aretakis' reliance on any oral promises and pre-hire discussions regarding the potential spin-off and the accompanying stock options was unreasonable as a matter of law.

**1.    Applicable Law**

Under Massachusetts law, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Michelson v. Digital Financial Services, 167 F.3d 715, 724 (1st Cir. 1999) (quoting Veranda Beach Club Ltd. Partnership v. Western Sur. Co., 936 F.2d 1364, 1380 (1st Cir. 1991)). "An element of promissory estoppel is that the party invoking it must have *reasonably* relied on the alleged promise to his detriment." Coll v. PB Diagnostic System, Inc., 50 F.3d 1115, 1125 (1st Cir. 1995) (emphasis added) (quoting Hall v. Horizon House Microwave, Inc., 506 N.E.2d 178, 184 (Mass. Ct. App. 1987)).  Significantly, "[w]here a written statement conflicts with a prior oral representation, reliance on the oral representation is generally held to be unreasonable." Coll, 50 F.3d at 1124;  see also Trifiro v. New York Life Insurance Co., 845 F.2d 30, 33-34 (1st Cir. 1988) (finding that the conflicting content of the defendant's oral statement with his written statement should have placed the plaintiff on notice that he should not rely on either statement).

### 2.    Aretakis' Reliance on Oral Promises Was Unreasonable

Plaintiffs' reliance on Coackley's alleged promises was unreasonable in light of the conflict between those verbal statements and her written employment agreement.  During her deposition, Aretakis testified that when she raised the issue of equity in the new company during pre-hire negotiations, both Coakley and vonReichbauer told her that such language could not legally be included in her employment contract.   Despite the obvious inconsistencies between these promises and the written agreement, Aretakis took no steps to investigate or resolve the issue.  As such, Plaintiffs cannot argue that their reliance on such a promise was reasonable.  See McMahon v. Digital Equipment Corp., 162 F.3d 28, 39 (1st Cir. 1998) (finding reliance to be unreasonable as a matter of law "[w]here a written statement conflicts with an oral statement," because "Massachusetts law assumes that a reasonable person will investigate further").

In an analogous case, the First Circuit held that an employer's refusal to "firm-up" pre-hire discussions concerning compensation rendered any reliance on prior oral representations unreasonable.  In Coll, the plaintiff, a former CEO, claimed the defendants offered him various incentives during pre-hire discussions in order to persuade him to accept the CEO position.  50 F.3d at 1124.   The written employment offer, however, "was clearly at odds with [Coll's] understanding of [defendant's] prior oral representations regarding long-term compensation."  Id. When Coll raised a concern that the offer did not seem to obligate defendants to pay him the incentives discussed during pre-hire negotiations, defendants provided him with a second offer containing the same noncommittal language.  Coll accepted this second offer.

The Court granted summary judgment to defendants because it found that Coll's reliance on the oral promises was unreasonable:

> [c]onfronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying.  A reasonable person does not

> gamble with the law of the excluded middle, he suspends judgment until further
> evidence is obtained. Explicit conflict engenders doubt, and to rely on a
> statement the veracity of which one should doubt is unreasonable. The law does
> not supply epistemological insurance. Nor does it countenance reliance on one of
> a pair of contradictories simply because it facilitates the achievement of one's
> goal.

Id.

Here, when Aretakis expressed concern over why the equity in the spin-off was not included as part of her offer, she was told by both Coackley and vonReichbauer that such an incentive could not be included in the contract, and she did not investigate the issue any further but instead signed the offer letter. GSN's refusal to "firm-up" this promise rendered any reliance on prior oral representations concerning the stock options unreasonable. See Coll at 1125.

Aretakis' argument that she reasonably relied on Coackley's representations is further undercut by her own testimony. She testified that one of her main concerns regarding the job "was, obviously, how secure was it that [GSN] was going to have a spin." In response to her concerns,

> [Coackley] talked about why he believed this was far less risky than joining a
> startup, and he went through some modeling and . . . what other companies in this
> space were performing at on the open market, and he basically took me through
> several numbers and formulas of why this would yield to me a very significant
> upside in terms of the options. And assuming that this went in conjunction with
> the growth plan, expanding the business where he had believed we could expand
> the business, there was tremendous more upside. So even being on the
> conservative side, you know, he didn't see that as what he called a risky endeavor.

(Aretakis Dep. 40:17-24; 41:1-6.) In Aretakis' own words, she understood that the spin-off was certainly not a "done deal" and that the process was "risky." The formulas were based on "modeling" and "examples," and Coackley's own "belief" that there was tremendous upside notwithstanding the risk. It is unreasonable for a businessperson of Aretakis' experience and

sophistication to uncritically rely on such promise of riches.  See McMahon, 162 F.3d at 39 (Massachusetts law assumes that a reasonable person will investigate discrepancies between oral and written promises further).

In the end, Coackley's refusal to include any promises of stock options in Aretakis' written contract rendered any reliance on prior oral representations unreasonable.  Furthermore, Aretakis' knowledge that the "spin" process had some element of risk to it, and the fact that the spin-off involved complex business contingencies which she failed to inquire about, provides additional support for this argument.  Accordingly, her promissory estoppel claim fails as a matter of law.

## C.    Claim For Deceptive Practices Under Chapter 93A

Plaintiffs' allegation that GSN offered Aretakis stock options associated with the potential spin-off is not actionable under Mass. Gen. Laws ch. 93A (hereafter Chapter 93A) because it arises out of an "employment relationship" between the parties.  The remedies of Chapter 93A are not available to employees in disputes which arise from the employment relationship.  McAdams v. Massachusetts Mutual Life Ins. Co., 391 F.3d 287, 303 (1st Cir. 2004).

### 1.    Applicable Law

Chapter 93A protects against unfair and deceptive trade practices.  However, to come within the reach of the statute, "[a] dispute must involve a 'commercial transaction.'" McAdams, 391 F.3d at 303 (citation omitted).  "The Massachusetts Supreme Judicial Court has interpreted this to include only transactions that are 'offered generally by a person for sale to the public in a business transaction' and to exclude transactions that 'are principally private in nature,' such as a dispute between employer and employee."  Id. (citing Manning v. Zuckerman,

388 Mass. 8, 13, 444 N.E.2d 1262, 1265 (1983)). "Similarly, although a company . . . engages in trade or commerce, the hiring and firing of employees is not part of the company's commercial activities . . . ." <u>Manning</u> at 13, 444 N.E.2d at 1265.

### 2.    Aretakis' Claim Is Not Commercial But Arises Out Of Her Employment

Plaintiffs' allegations that the "deceptive conduct" at issue under this claim occurred *before* the employment relationship was consummated does not salvage the claim.   The appropriate inquiry under Chapter 93A "is not when the alleged misconduct took place but whether, '[t]aken as a whole, the allegations . . . may not be characterized fairly as arising out of an employment contract.'"  <u>Sargent v. Tenaska, Inc.</u>, 914 F. Supp. 722, 731 (D. Mass. 1996), <u>aff'd</u>, 108 F.3d 5 (1st Cir. 1997).

<u>Sargent</u> is illustrative.  There, plaintiff argued that Tenaska promised him an ownership interest in five related entities, and subsequently failed to deliver.  <u>Sargent</u>, 914 F. Supp. at 727. Sargent argued that this violated Chapter 93A because "the unfair or deceptive conduct occurred *before* and *after* – but not *during* – his employment with the company, thus removing the conduct from the employment context." <u>Id.</u> at 731 (emphasis in original).

The district court rejected Sargent's argument and granted summary judgment to Tenaska:

> It is simply obvious that Sargent's claim emerges from the parties' employment relationship . . . . Sargent's claim stems from the company's failure to tender certain interests, which, plaintiff claims, it agreed to make available to him under the terms of their employment contract . . . . It could not be clearer that plaintiff's claims arise from his employment relationship.

<u>Id.</u> at 731-32.; <u>see also</u> <u>Whelan v. Intergraph Corp.</u>, 889 F. Supp. 15, 21 (D. Mass. 1995) (granting motion to dismiss plaintiff's Chapter 93A claim: "[i]n the absence of explicit language supporting a c. 93A claim in the context of the recruitment of a prospective employee and in the

absence of any Massachusetts authority recognizing such a claim, it would not be appropriate for this court to do so."); Farrington v. DeAngelis, 2000 WL 1273868 (Mass. Super. April 14, 2000), Naples Aff., Ex. I (holding that promise of an equity interest in company does not become a Chapter 93A claim based on the allegation that the promise was made prior to the commencement of employment because "[s]uch a dispute clearly arises out of the employment contract").

Similarly, there can be no doubt that Plaintiffs' claim under Chapter 93A emerges from the parties' employment relationship. The allegations stem entirely from GSN's failure to tender certain interests, which, Plaintiffs claim, they agreed to make available under the terms of an oral employment contract. None of the actions attributed to the Defendants in Plaintiffs' Complaint took place outside of the employment relationship. See Hoffman v. Optima Systems, Inc., 683 F. Supp. 865, 871 (D. Mass. 1988) (dismissing Chapter 93A claim because dispute over equity compensation arising out of an oral employment contract negotiated before plaintiff began working for defendant "occurred in the context of the parties' employment relationship . . ., and not in an arms-length commercial transaction between distinct business entities.") (citing Manning, 388 Mass. at 11, 444 N.E.2d 1262). Accordingly, Plaintiffs' claim is not within the purview of Chapter 93A and summary judgment in favor of Defendant is appropriate.

Furthermore, even if GSN's recruitment of Aretakis was "commercial" in nature, GSN did not disregard or breach a "contractual" arrangement as required by the statute. Only "conduct that is in disregard of known contractual arrangements and intended to secure benefits for the breaching party falls afoul of Chapter 93A." McAdams, 391 F.3d at 304; Kuwaiti Danish Computer Co. v. Digital Equipment Corp., 781 N.E.2d 787, 800 (Mass. 2003) (Chapter 93A claim was dismissed because defendant did not "disregard or breach" a "known contractual

arrangement" with the plaintiff).  As previously discussed,  the promise of stock option equity in the "spin-off" company was *not* "contractual."  Plaintiffs' claim fails as a matter of law.

**D.    Fraud**

Plaintiffs' fraud claim is based on allegations that Coackley deliberately misrepresented to Aretakis that the spin-off would occur in the summer of 1997 and that she would receive an equity interest in the new company.  To survive this motion, Plaintiffs must present evidence demonstrating that (1) Coackley's statements were knowingly false when made, (2) he made the false statements with the intent to deceive, and (3) they reasonably relied on the statements.  See Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir. 1986) (reciting the elements of common law fraud).  This they cannot do.

First, Plaintiffs' fraud claim fails because, as discussed above, the inconsistencies between the allegedly fraudulent statements and Aretakis' written employment agreement means that she could not have reasonably relied on those statements.  See Turner, 809 F.2d at 97-98 (finding that no action for fraud exists when a knowledgeable buyer signs a contract that conflicts with his or her understanding of the agreement); Plumer v. Luce, 310 Mass. 789, 39 N.E.2d 961 (1942) (no action for fraud where a plaintiff with considerable business intelligence signed a contract that was clearly at variance with the defendant's prior statements regarding their agreement).  The inconsistencies between the alleged promises and the offer letter and addendum which Aretakis signed precludes the argument that Aretakis "reasonably relied" on Coackley's statements.

Second, even if Aretakis' reliance was reasonable, Plaintiffs' fraud claim fails because there is no evidence that Coackley's representations to Aretakis were "knowingly false" statements of material fact.  See Sargent, 914 F. Supp. at 730; Adams v. Hyannis Harborview,

Inc., 838 F. Supp. 676, 694 (D. Mass. 1993). Aretakis acknowledges that GSN and General Signal actively pursued the spin-off well into 1998. There is no evidence that Coackley knew that the spin-off would occur while he was recruiting Aretakis in early 1997.

In the end, Plaintiffs must present "something beyond speculation to support [their] claim of a contemporaneous intent to defraud." Sargent, 914 F. Supp. at 731. As demonstrated, there was nothing fraudulent about Coackley's statements regarding the spin-off, nor was there any intent to deceive. As a result, Plaintiffs claim for fraud fails as a matter of law.

## CONCLUSION

The evidence in this matter fails to raise a genuine issue of material fact supporting any of Plaintiffs' claims. Therefore, summary judgment is appropriate on all counts.

INRANGE TECHNOLOGIES CORP.

By its attorneys,

Dated: January 27, 2006

_/s/ Thomas J. Conley_____
Thomas J. Conley (*Pro Hac Vice*)
Leonard, Street and Deinard, PA
150 South Fifth Street, Suite 2300
Minneapolis, MN 55402
(612) 335-1634
(612) 335-1657 (fax)

Jeffrey L. Levy (BBO#559438)
Corrigan & Levy LLP
896 Beacon Street
Boston, MA 02215
(617) 247-3800

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those identified as non-registered participants on January 27, 2006.

_/s/ Jeffrey L. Levy_____

2699753.6

21