UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EVANTHIA C. ARETAKIS and CHARLES F. SVIRK, JR.,

Plaintiffs,

v.

INRANGE TECHNOLOGIES CORP.,

Defendant.

Civil Action No. 05-10257-DPW

**AFFIDAVIT OF JONATHON T. NAPLES**

Jonathon T. Naples, hereby deposes and states as follows:

1. I am one of the attorneys representing the Defendant in this matter. I make this Affidavit in support of Defendant's Memorandum in Support of Motion for Summary Judgment. Attached to this Affidavit are the following documents:

2. Attached as Exhibit A is a true and correct copy of excerpts from Plaintiff Evanthia C. Aretakis' Deposition transcript dated September 23, 2005.

3. Attached as Exhibit B is a true and correct copy of Aretakis Deposition Exhibit 2.

4. Attached as Exhibit C is a true and correct copy of Aretakis Deposition Exhibit 3.

5. Attached as Exhibit D is a true and correct copy of Aretakis Deposition Exhibit 11.

6. Attached as Exhibit E is a true and correct copy of Aretakis Deposition Exhibit 14.

7. Attached as Exhibit F is a true and correct copy of Aretakis Deposition Exhibit 19.

8. Attached as Exhibit G is a copy of an article in the Philadelphia Business Journal dated 12/19/1997 entitled "General Signal ready to spin off."

9. Attached as Exhibit H is a copy of Montlouis v. Pirus Networks, Inc., 2005 WL 1009523 (Mass. Mar. 15, 2005).

10. Attached as Exhibit I is a copy of Farrington v. DeAngelis, 2000 WL 1273868 (Mass. Super. April 14, 2000).

11. Attached as Exhibit J is a true and correct copy of Aretakis Deposition Exhibit 21.

Signed under the penalties of perjury this 26th day of January, 2006.

s/Jonathon T. Naples____________________
Jonathon T. Naples

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those identified as non-registered participants on January 27, 2006.

_*/s/ Jeffrey L. Levy*_____________

2709172.1

PAGES 1 - 169

EXHS. 1 - 23

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * *

Evanthia C. Aretakis and *

Charles F. Svirk, Jr. *

v. * Civil Action

General Signal, Inc., * No. 05-10257/DPW

et al. *

* * * * * * * * * * * * * *

Video Deposition of Evanthia C. Aretakis

Friday, September 23, 2005

Corrigan & Levy

896 Beacon Street - 3rd Floor

Boston, Massachusetts 02215

----------- J. EDWARD VARALLO, RMR, CRR ----------

COURT REPORTER

EXHIBIT
tabbies
A

A. Sultana, and she's 12 years old, and Charles III, and he is 15 years old.
Q. Before that address, where did you live?
A. 144 Federal Hill Road, Hollis, New Hampshire.
Q. How long did you live at that property?
A. Approximately three years.
Q. So 2001 is when you moved there, roughly?
A. Roughly.
Q. Before that property, where did you live, what town?
A. Parkland, Florida.
Q. Where is Parkland?
A. Between Fort Lauderdale and West Palm Beach.
Q. What were the dates that you lived in Parkland, roughly?
A. Three years, for about three years. So three years preceding the move to New Hampshire.
Q. So roughly 1998 to 2001?
A. Right, about that.
Q. And before Parkland, Florida, where did you live?
A. Chelmsford, Massachusetts.

Q. And that is when you worked for GSX?
A. Right.
Q. We're going to have to agree on some convention here for the names of these companies.
A. Okay.
Q. When you worked there, what did you refer to it as?
A. Well, it was Tautron, the unit, when I got there, which was part of General Signal Networks, which was then part of General Signal.
Q. Okay.
A. So, and in the process there were a number of different name changes and combinations. So at the time --
Q. How would you like to refer to it?
A. Why don't you call it General Signal Networks, GSN.
Q. GSN, it's a deal. All right.
Where did you grow up as a child?
A. Upstate New York.
Q. What town?
A. Guilderland.
Q. And then tell me a little bit about your educational background, please. Where did you go to

college?
A. Union College, Schenectady, New York.
Q. What year did you graduate?
A. '81. 1981.
Q. Did you do any graduate work after that?
A. No. I did some courses but never went formally to graduate school.
Q. After you graduated from Union in 1981 what was your first professional job?
A. An engineer for Texas Instruments.
Q. Located where?
A. Dallas, Texas.
Q. And what were the dates that you worked for TI?
A. Hmmm. Roughly -- I'm going to try to reconstruct this -- I would say probably '81 to roughly '83 or so.
BY MR. ARETAKIS:
Q. Rather than guess or generalize, would you have a resume?
A. I do, but probably my first jobs are no longer on there, so.... But I can give you a list of history and --
BY MR. CONLEY:

Q. I just want it very briefly. I actually was going to ask you about the resume as well. All right. You left TI about 1983. Where did you go?
A. I went to Raytheon Data Systems in Norwood, Massachusetts.
Q. What dates?
A. Hmmm. Right from Texas Instruments, so it was '82, '83 to -- I'm trying to think. After they sold to Telex. So it must have been roughly '85 or so.
Q. Did you work as an engineer for Raytheon?
A. Yes, and I also managed a support center for them.
Q. After you left Raytheon, where did you go?
A. I went to a company that was acquired by Siemens, Databit, on Long Island, New York.
Q. How long were you at Databit?
A. Hmmm. Probably several years. Probably three years. But it had already been acquired by Siemens at the time.
Q. Okay. So maybe up to, what, 1988, '89?
A. Around -- Around there. I'd say '88 probably.
Q. All right. After Databit or Siemens,

Page 11

where did you go?

A. Well, then Databit was folded into the Siemens operation in Boca Raton, Florida, so I was actually transferred to Boca.

Q. When did you move to Boca?

A. Roughly around that time, probably '88 or '89.

Q. And then did you stay at Siemens until you took the job at GSN?

A. Yes, I did.

Q. At Siemens how did your career progress? What promotions did you have?

A. I worked as manager in product line management doing their support and sales support and then I progressed into various units and before I left for GSN I was the vice president of one of Siemens' business units. It was called the EWSD business unit, which provided digital switching to telephone companies in the North American market.

Q. Okay, let me zero in on the 1997 time frame. You're at Siemens, you're down in Boca. Right?

A. Mm-hmm.

Q. Yes? Remember, you have to answer audibly.

Page 12

A. Yes.

Q. When was the first time that you heard of GSN or General Signal or any of those companies?

A. One of their recruiters contacted me.

Q. Do you remember the name of that recruiter?

A. I believe it was Christian & Timbers.

Q. And in particular was it Jeff Christian? Was he the individual who contacted you?

A. He was one of the individuals from his firm.

Q. I think it's actually, we can clarify this later, I think it's actually Timbers & Christian, just so we're --

A. It could be. It could be. I'm sure I have it someplace written down.

Q. And if I understand you correctly, there was more than one recruiter that you had contact with in this process?

A. Yes.

Q. Who else besides Jeff Christian?

A. I really don't recall the names.

Q. Male or female?

Page 13

A. I really don't recall. I had talked to -- At that time I had talked to a number of different companies that were representing other companies as well, so.... But I know that originally Christian & Timbers, I believe the first person I had talked to from that firm was not Jeff.

Q. And this as I understand it was in the January time frame, January 1997? Does that sound right?

A. Perhaps even earlier than that, but probably very close to January '97.

Q. Were you interested in moving from Siemens at that period of time?

A. Yes.

Q. Why were you considering leaving Siemens let's say early '97?

A. I was looking for a position with a company where I would have an equity stake and Siemens, as far as being a large global multinational company, equity participation was very minor.

Q. Now, let's define our terms here. When you talk about an equity stake, what exactly do you mean?

Page 14

A. Stock options.

Q. While you were at Siemens, did you have any stock options?

A. I have had stock options with Siemens. I just can't recall if I had them before I went to General Signal or after. I would have to dig through my records.

Q. We'll get into this later. But did you go back to Siemens after you left General Signal?

A. Yes, I did.

Q. Okay.

You said one reason or the reason you wanted to leave Siemens was in order to get an equity stake. Were there any other reasons that you were interested in leaving Siemens in this early 1997 time frame?

A. No. I was very satisfied with my current position at Siemens.

Q. If you had stayed at Siemens, and you may not be able to answer this, if you had stayed at Siemens, what would have been the next step up the career ladder for you?

MR. ARETAKIS: Make an objection just for the record. You can answer. (Pause) You can

Page 19

Q. Definitely not?
A. Yeah.
MR. ARETAKIS: Also, I know you probably don't want this information but it might be relevant. During that period of time I believe her parents also owned a home in Boca Raton, Florida. So, and pardon me for being a partial witness in this case, but I would like to just help you along as quick as possible.
MR. CONLEY: We're going to have to swear you in if you keep that up.
BY MR. CONLEY:
Q. There were other -- Excuse me. In this January or let's say early 1997 period of time, there were some other job offers that you were considering. Right?
A. There were other companies that had solicited me based on my experience.
Q. Which other companies, if you can recall, were soliciting you at that period of time?
A. Oh, I probably can't recall off the top of my head, but several that were I'd say pre-IPO, so I had talked to a number of venture companies. Which is one of the draws to the Boston area. In my field

Page 20

the two big hubs were in this area and in California.
Q. And when you say in your field, what do you mean by that?
A. Telecommunications.
Q. Were there any companies other than GSN that you were close to doing a deal with or close to accepting employment with?
A. No.
Q. I've seen references -- and we'll look at the particular letter later -- to a particular startup company. Do you know, do you recall a particular startup company that you were close to accepting an offer from?
A. I can't really recall. I know I talked to a number of startup companies and I also know that several venture firms had asked me to speak with some of their holdings, and in some cases they were established; in some cases they were, I would say, less established.
Q. But you don't remember the name of any of them in particular at this point?
A. No. No.
Q. Is there anything you have that you could

Page 21

look at that would help you remember those names?
A. There might be. I would have to check.
Q. Well, what would you be looking for?
A. Maybe just an old calendar or datebook.
Q. Have you kept in touch with Mr. Fromm since leaving Siemens?
A. Yes, I have.
Q. Where is he today, if you know?
A. In Boca Raton, Florida.
Q. Is he retired or still working for Siemens?
A. No, he doesn't work for Siemens. He, I believe, is doing some consulting on his own. He was with Ericsson or an affiliate of Ericsson up to I'd say a few months ago.
Q. Sounds like you're in communication with him. I mean, you keep in touch with him?
A. Oh, say a couple of times a year. A few times a year.
Q. So if I asked you for his phone number, you would be able to look it up and give it to me?
A. Oh, sure.
Q. You don't know it off the top of your head, do you?

Page 22

A. No, but I could find it.
Q. Okay. Some people remember phone numbers and others don't.
Just to finish out this loop: When you left GSN, you went back to Siemens. What position did you go back into?
A. I took over all of sales for all of the units.
Q. Put some dates on that, if you would, please, that you were in that position.
A. Let's see. I left GSN, I was home for a bit, a few months, took some time off, and then I believe -- and, again, I don't really recall the exact date -- but I'd like to say I started around the September time frame.
Q. And this is 1998?
A. Yes.
Q. All right. And how long did you stay in that position?
A. Let's see. Hmmm, have to think back now. I'm going to say probably a couple of years.
Q. 2000, 2001? Do you remember the year that you left that position?
A. So it was roughly when I moved back up

Page 23

North, so let's see. If I've been here probably five years, so it's roughly about 2000.
Q. Who did you report to in your sales position at Siemens?
A. Fred Fromm.
Q. Why did you leave Siemens for the second time in 2000?
A. I didn't exactly leave Siemens. I took over the general manager position for a voice unit that Siemens owned up in the Massachusetts area that they were packaging together with some startup technology and acquisitions. So I just moved into a different kind of position.
Q. You were the general manager of a particular facility up here?
A. I was general manager of a business, voice switching.
Q. Voice switching?
A. Yes.
Q. How long did you remain in that position?
A. Probably about a year.
Q. And who did you report to in that position?
A. To the CEO of that group, which was Jim

Page 24

Dolce.
Q. And spell Dolce for us, please.
A. D-o-l-c-e.
Q. You stayed in that position for about a year?
A. Perhaps a little bit longer than that.
Q. And these dates, I assume, would be on your resume?
A. Yes, all these dates.
Q. Okay. Where did you go after that position?
A. So then Siemens owned this unit, it was a conglomerate of Siemens technology, startup technology, and they decided at that point in time to split the unit. For simplicity reasons, I'll say one part was a voice-centric group and one was a data-centric group. They decided the data-centric group they would sell to Juniper Networks and the voice-centric group they wanted to build as a separate unit in Siemens. So I basically brought that as a stand-alone unit all back together and grew that for Siemens.
Q. What was that unit called?
A. Siemens Network Convergence, SNC for

Page 25

short.
Q. Who did you report to in that position?
A. To a board.
Q. And what are the approximate dates that you were in that position?
A. From that point that we were talking, so probably 2002, roughly 2002 till currently.
Q. You're still in that position?
A. Yes, I am.
Q. Are you still the -- Is your title still general manager?
A. No, CEO and president.
Q. Of what exactly?
A. Of Siemens Network Convergence.
Q. Based where?
A. In Chelmsford, Mass.
Q. What is your current compensation arrangement with SNC?
A. With SNC? I have a base salary and I work off of two bonus plans.
Q. Okay, let's go back to early 1997 and I want to focus in on your contacts with Christian & Timbers, or Timbers & Christian, whichever it is --
A. Okay.

Page 26

Q. -- and with GSN.
A. Okay.
Q. Tell me what you can remember about your initial contact. Was it by telephone?
A. Yes, it was.
Q. From the recruiter?
A. Yes.
Q. What do you remember about that?
A. He called looking for someone with my experience in telecom to run a unit in Massachusetts, the Tautron unit, as part of General Signal, that was looking at three things: a breakout strategy, something to take it into a new line of business; that would provide leadership to a team that would be part of a spinoff of GSN from GS, from General Signal; and someone that could run and had very well-established contacts into the telecommunications marketplace with the existing telecom providers.
Q. And this was all in the initial phone call from the recruiter?
A. Yes.
Q. In this initial phone call did the recruiter identify the employer as General Signal?

Page 27

A. I probably.... Can't recall, but I imagine so. Usually I wouldn't talk to someone unless I knew who they were talking about.
Q. And you obviously showed some interest in the position. Right?
A. Mm-hmm.
Q. Yes?
A. Yes, mm-hmm.
Q. Okay. What was the next step in the process?
A. There were many -- There was a series of phone calls. Obviously, one of the issues for me was just the relative size. I at the time was running a 500-million-dollar unit; this unit was a 60-million-dollar unit. It really made no sense, unless they were really interested in an expansive portfolio, which, you know, meant direct investment as well as potentially acquisitions. So a lot of the calls were associated with talking about was there really the intent to invest. And then the other issue was equity. Because I was not interested in leaving Siemens for anything that didn't have some significant equity position.
Q. These calls that you were just describing,

Page 28

were they all with a recruiter or did you at some point speak with somebody from the business?
A. I spoke with the recruiter, Bob Coackley and Bill Von Reichmeier, bauer. I've got to remember.
Q. Get a spelling on that just to get it out of the way. It's v-o-n capital R-e-i-c-h-b-a-u-e-r. Right?
A. That's probably a good guess.
Q. I'm reading it from a letter so it's more than a guess.
A. Okay.
Q. So you talked to the recruiters, you talked to Mr. Coackley, and you talked to Mr. von Reichbauer in the process leading up to your acceptance of the job.
A. Right.
Q. Anybody else that you talked to about the job before you accepted it other than your husband or, you know, anybody else from General Signal?
A. Oh, from General Signal? No. During the process I did interview with Mike Lockhart, I'd say very briefly.
Q. And just so the record is clear,

Page 29

Mr. Lockhart at the time was the CEO of --
A. Of General Signal.
Q. All right. Anybody else? Anybody else from the company that you talked to prior to accepting the position?
A. I know I had spoken to several people but I can't recall if it was after I had accepted the position, because he was in the process of changing some of the key positions. Bob Coackley, that is.
Q. Do you remember the first time that you spoke with Mr. Coackley?
A. Yes.
Q. Can you put a time frame on that for us?
A. No. It was a telephone call.
Q. What do you remember about that telephone call?
A. I remember that the issue was the validation of equity and we spent a lot of time talking about the equity position and that, for me, it didn't make sense for me to leave my current position unless that equity position was really prevalent. And Bob made it very clear that he was looking at the eight top members of his team to share 5 percent, so that each member would have

Page 30

five-eighths of 1 percent of equity in the spinoff of the company. And he did some valuations on that in terms of how he perceived that was about to happen and also walked through some time lines and sense of urgencies about getting his team in place because his expectation was this spin was going to happen before the summer had completed.
Q. I'm assuming that what you've just told me represents several different conversations with Mr. Coackley. Is that fair?
A. Probably so.
Q. Okay. Can you give me a sense as to how many conversations you had with Mr. Coackley before you accepted the job offer at GSN?
A. I would say several. And then face to face as well. And.... But several telephone conversations, particularly on the equity issue as well as the growth opportunity in terms of the unit growth.
Q. How many face-to-face meetings had you had with Mr. Coackley before accepting?
A. I'd say at least two. But I don't recall the exact number.
Q. And those would have been where?

Page 35

Q. All right. So now if you would turn your attention to this first page and maybe just go through it and tell us first what is written on here. Just read it for us.
A. Okay. 20 million shares times 5 percent, one million shares divided by eight, 125K, 25 percent per year over four years. And also I think it's Jean Santoro, who was a lawyer for the company at the time. I don't know why the name is there, but....
Q. Okay. Now, you've just read for us the actual words --
A. Yes.
Q. -- that you'd written down here. What's your recollection of what those words mean?
A. Okay. So where we keyed in was in terms of the equity position; and Bob Coackley made it clear that there was going to be 5 percent of the equity of the company that would be divided by the eight senior people, which would yield roughly a million shares at 125,000 shares for each of the eight people. That would vest over a four-year period from the inception of the spinoff, obviously.
Q. And by vesting, you mean that -- Let's

Page 36

just for simplicity's sake let's assume the spinoff occurred on December 31, 1997. 25 percent of those shares then would vest on December 31, 1998? Is that your understanding?
A. That's correct.
Q. And then another quarter in '99?
A. Correct. And at the time he also explained that there would be further tranches of shares or options allocated, so this would be the initial and then there would be further. But we focused on the initial, because obviously I wanted to understand that.
Q. When you were making these notes, did you understand what form the equity would take in the company?
A. Options.
Q. And back then what was your understanding of how an option works?
A. Basically there was going to be a pre-IPO price established and then basically I could exercise against that price at maturity when I'd achieved the vesting schedule, those options or any options that were in that vesting schedule.
Q. So to really dumb this down for the

Page 37

nonfinancial lawyer, what you're saying is there might have been a pre-IPO price set of $20 a share. A year after the spinoff when you were ready to exercise the first 25 percent, if the shares were trading at $40, you'd still pay $20 per share for your quarter of the total?
A. Correct.
Q. Okay.
And presumably if the share price had gone down, which certainly happened with some IPOs, you'd still have to pay the $20 per share?
A. Well, you wouldn't. You wouldn't exercise your options.
Q. Okay. All right.
Was the plan that -- Excuse me. As you understand it before you accepted your job, was the plan that the spinoff would be a publicly traded company?
A. Correct.
Q. And that it would trade on one of the stock exchanges?
A. Correct.
Q. Okay, look at the second page, then, please, and it looks as though, appears there are

Page 38

three different sticky notes.
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Are these three separate conversations or all one conversation?
A. No, all part of the same conversation.
Q. Are these part of the same conversation as the one reflected on the first page?
A. Yes, it is.
Q. So one conversation, all four sticky notes?
A. Right.
Q. Okay. Walk us through then the one on the top of the second page.
A. Excuse me. It was subsequently validated several times in other conversations. So we kept coming back to this five-eighths of 1 percent.
Q. And we'll get to that.
A. Okay, so....
Q. So just tell us what the top one on the second page says.
A. "Fair market value is what the board defines, 20 million shares outstanding, five-

eighths, granted options, lower strike price at a private company." I'm not sure exactly what some of these scribbles, the words say. "Fair market value" and I think it says "liquidity file."

Q. Liquidity file?

A. I'm not sure what this says.

Q. And then it looks like there's a number next to it?

A. It looks like 83-something.

Q. Do you know what that refers to?

A. No. I don't recall that part.

Q. Okay. All right. And then the next one, please, what does that say?

A. 20-dollar options at $10, vesting start date, options to purchase shares, right for more options, and then half; equity stake grants five-eighths of 1 percent, expect $20 in two years, 36,500 options, P/E change from GS of 16 or 17 to double, and then 225 divided by 33 million.

Q. Do you know what that last piece refers to, 225 divided by 33 million?

A. I don't recall.

Q. Okay. Go back up to the top of the page, please; it says "fair market value something the

board defines -- is what the board defines"?

A. Right.

Q. Do you understand what you meant when you wrote that down?

A. What Bob was explaining to me as part of his inducement to join is that it was -- Because one of the issues I had was, obviously, how secure was it that he was going to have a spin. Once the spin happened, the options would be priced at whatever fair market value was, so whatever an external buyer of the shares would be able to buy a share at would be what your options were priced at. Prior to the spin there would be another price established for our equity position, so that part of his issue was to induce people like myself to sign up before the spin actually occurred.

So then he talked about why he believed this was far less risky than joining a startup, and he went through some modeling and he used the example of GS's P/E rate and what other companies in this space were performing at on the open market, and he basically took me through several numbers and formulas of why this would yield to me a very significant upside in terms of the options. And

assuming that this went in conjunction with the growth plan, expanding the business where he had believed we could expand the business, that, you know, there was tremendous more upside. So even being on the conservative side, you know, he didn't see this as what he called a risky endeavor.

Q. And again I want to define a term here. We've been using the term spin.

A. Mm-hmm.

Q. Tell us, if you would, exactly what you understand that term to mean.

A. Basically that General Signal will separate out General Signal Networks as a publicly traded company. And, I mean, General Signal may or may not still maintain sort of an equity position in General Signal Networks at that point.

Q. Did that then in your mind necessarily involve General Signal Networks doing an IPO? Is that part of the spin?

A. Yes, yes.

Q. So the spin is kind of two parts. It's the divestiture from General Signal and then the IPO --

A. Correct.

Q. -- to enter the equity markets?

A. Correct.

Q. On the second note on this page there's a reference to 20-dollar options and then $10.

A. Mm-hmm.

Q. Do you recall what you meant by that note?

A. Bob felt that the going-out price, what he called as once the IPO was issued, would go out at roughly $20. And he believed that the option price would be, you know, someplace in the neighborhood of $10 or so.

Q. Okay.

A. So that there was an immediate value, though obviously that value isn't cashable until you had vested.

Q. And did you have an understanding from Mr. Coackley about how those values would be set?

A. I didn't -- I kept trying to understand how the pre-value was getting set. And I can't really recall exactly the answers to that. He just kept coming back to this view that there would be a fairly reasonable difference between those of us that joined pre-IPO versus post-IPO and that's where these 10 and 20-dollar numbers. And the 20-dollar

Page 43

he actually worked out in terms of what he felt the valuation of the company was based on revenue, and he also kept coming back to why that was a very conservative value based on where they were at that point in time on revenue and profitability.

Q. You understood, I think, based on what you told me earlier that the GSX board of directors would play a role in setting those prices, those values. Right?

A. Yes. But I would say that Bob Coackley at the time led me to believe that he had many things already agreed with the board.

Q. Did he tell you what things he had agreed with the board?

A. Well, the five-eighths of a percent. Because I obviously kept coming back to this issue. In fact, at one point I said to Bob if there was a risk, then it wouldn't make sense for me to force my husband to move, sell my home; perhaps I should reconsider that I take the position but I commute from Boca Raton, Florida, get an apartment up in Mass. and commute. And he felt that this was agreed and that they were far enough along that this spin was imminent and he kept using the term end of

Page 44

summer. That it was very critical to him to have a team that was totally committed and wanted me in place up in Massachusetts as soon as possible.

Q. Other than bringing the team together, did you have any understanding about what other things had to happen before the spin could take place?

A. He had said that the key issue was to fill two vacant positions. So those were at least what he had relayed as being the key issues to having the spin.

Q. Any other issues besides filling those two vacant positions?

A. At the time that I was interviewing?

Q. Right.

A. No. It wasn't until later that I found out that there were many other things that hadn't been completed.

Q. When you were interviewing, was there any discussion of the role that the IRS would play in the spin?

A. There was discussion, but he had said that, you know, they'd already started; they had had a number of meetings obviously and, you know, felt things were moving along. And his biggest issue was

Page 45

time was of the essence.

Q. You understood, though, that the IRS had to issue a favorable tax ruling in order for the spin to happen. Right?

A. I didn't really understand that specific issue till later.

Q. Did Mr. Coackley talk with you at all about the SEC's role in the spin process?

A. No. He didn't discuss that.

Q. On the third note on the bottom here you have written the word "grants."

A. Mm-hmm.

Q. And I don't remember. Was that in connection with something else in your note there?

A. No. He just -- Nothing that I can really remember.

Q. Do you know why you wrote "grants" down there?

A. I'm sure he used the word grants.

Q. Did you have an understanding at that point that there was a difference between grants and options when you were talking about stock options?

A. No, not really.

Q. Do you understand that today?

Page 46

A. Yes.

Q. What's your -- You've told us about how an option works. How does a grant work?

A. Well, I think today everyone uses grant as interchangeable in some way with options.

Q. Okay.

A. And then I think, just as a further clarification, this issue of the options and the five-eighths percent, I mean, it became evident later with some of Mr. Coackley's newer staff that everyone heard the same story.

Q. And we'll talk about that, but just give me their names. When you talk about the newer staff, who are you referring to?

A. At least the other GM, the other general manager, Jayne Fitzgerald.

Q. Okay. And that's Jayne with a Y. Right?

A. I believe so.

Q. All right. Anybody else that you're referring to who as you put it heard the same story?

A. I believe even some of his other staff heard very similar stories, because everyone had this five-eighths of 1 percent pretty well locked in.

Page 55

A. So I think he -- I think he understood. You know, at the time also, I mean, if you go back, at the time many people were making movements into a lot of startups for equity positions.
Q. This was in the heady days of the startup companies --
A. Exactly, exactly.
Q. -- and IPOs, okay. Besides Mr. Fromm and the other individuals we've talked about, anybody else that you talked with about the equity offer? And I'm thinking, you know, friends, ministers, counselors, anybody who could validate, using your word, what you were hearing from Mr. Coackley.
A. I did speak to my brother, not this one, the other one.
Q. The one in Arizona. What's his name again?
A. Nicholas.
Q. Okay.
A. Because he had already done several IPOs with companies.
BY MR. ARETAKIS:
Q. What do you mean by done?
A. Had been through several IPOs.

Page 56

BY MR. CONLEY:
Q. Anybody else besides Nicholas?
A. Let me think. I'm sure I talked to several other people.
BY MR. ARETAKIS:
Q. Did you ever have a labor lawyer or consult with any --
A. No. At the time, no.
BY MR. CONLEY:
Q. Where does Nicholas live today?
A. Arizona.
Q. Whereabouts?
A. Scottsdale.
Q. What did Nicholas tell you about the IPO process?
A. Well, I explained to him what Bob Coackley was explaining to me and he felt that in consideration of some of the pre-IPO companies that didn't have the kind of revenue that GSN had, that he agreed that this was a less risky endeavor. His view was I could probably get a greater participation in terms of just pure number of options, but in terms of -- and this is something I had found on the market as well -- of joining a

Page 57

company that was just starting to build revenue versus an established company of, you know, General Signal's size.
Q. Did Nicholas caution you or warn you about the IPO process in any respect?
A. No. I -- I don't think so.
Q. Back in this period of time, were you a regular reader of The Wall Street Journal?
A. Oh, pretty regular.
Q. Were there in this period of time, let's say early 1997, any other business periodicals that you read on a regular basis?
A. Things mostly in my line of business, telecommunications.
Q. How about Fortune magazine or Forbes?
A. Occasionally, sure.
Q. Forbes?
A. Sure, occasionally.
Q. Did you subscribe to The Wall Street Journal?
A. No. But it was subscribed to at the office so I could pick up a copy.
Q. Other than what you've told me today, did you do any other what I'm going to call due

Page 58

diligence around the issue of the GSN spin? And by that I mean did you check with any other sources, any other third parties about the spin?
A. No, I did not.
Q. Did you ever, for instance, go on the SEC's EDGAR database and look for information about the spin there?
A. No, not until later.
Q. Did you talk with Mike Lockhart about the equity concept during your interview with him?
A. No.
Q. And I trust that you wouldn't have talked to anybody on the GSX board of directors at that period?
A. No. At the time it was really very separate and Bob Coackley represented himself as CEO and president and that this would be a completely separate unit.
Q. Now, you knew that they had not yet picked a name for the new entity. Right?
A. Yes. They were in search of a name.
MR. CONLEY: Okay, let's take our break now.
MR. ARETAKIS: Okay.

Page 59

THE VIDEOGRAPHER: The time is 10:45 a.m. We're now going off the record.

( Short recess taken.)

( Aretakis Deposition Exhibits 2 through 6 marked for identification.)

THE VIDEOGRAPHER: The time is 11:02 a.m. We're now going back on the record.

BY MR. CONLEY:

Q. Okay, let's go back on the record. And, Ms. Aretakis, during the break I handed you your two offer letters, which we've marked as Exhibit 2 and Exhibit 3. Let's focus on the one that's Exhibit 2. It's the June 6, 1997 offer letter. Right?

A. Mm-hmm.

Q. And if you look at the last page of that, this has your signature on it. Right?

A. Correct.

Q. And this is the offer letter that was sent to you by GSN that you agreed to by signing it. Right?

A. Correct.

Q. I want to ask you a few questions about this. This indicates that you were going to be paid a weekly salary of a certain amount and that equated

Page 60

to $175,000 annually. Right?

A. Mm-hmm, correct.

Q. And that is in fact what you started at with GSN. Right?

A. Correct.

Q. Now, at Siemens, if I have done my homework, you were making about $162,000 a year. Right?

A. Could be. I don't really recall exactly. I know that in the end Siemens beat every offer that General Signal put on the table, so.....

Q. And let me just ask you about that quickly, because you alluded to that before. Did Mr. Fromm -- Fromm?

A. Yes.

Q. Was he the one who made the offer to you to stay?

A. Him and a Mr. Larry McMillan.

Q. Is there any documentation, any kind of letter demonstrating that offer?

A. They gave me a piece of paper that basically showed where I was today and what they were prepared to do. I don't know if I kept it, but I can check.

Page 61

Q. Okay, if you would. And what I'm going to do, just so you know, is I'm going to send a letter to your lawyer after the deposition following up on some of these things, just so we all remember.

A. Okay. I'm not sure it's something I kept, but I may have.

Q. Okay.

A. But I'm sure you could talk to Mr. Fromm and he would confirm that he also countered it.

Q. Okay.

As part of the offer then GSN also gave you a car allowance. Right?

A. Correct.

Q. And as I understand it, you did not have a car allowance at Siemens?

A. No, I did have a car allowance at Siemens.

Q. You did?

A. Yes.

Q. Do you remember how much it was?

A. It was more than this.

Q. And then you were paid a hiring bonus of $40,000?

A. Correct.

Q. And then you had two bonus opportunities

Page 62

at GSN. The first was 25 percent of base salary if GSN met its performance targets. Right?

A. Correct.

Q. And then the second one was an incentive based on operating income for the Westford operations?

A. Correct.

Q. And Westford is the operation that you managed?

A. Correct.

Q. And then in the fifth paragraph in the offer letter it talks about stock options and particularly a thousand options subject to approval by the GS board of directors. Right?

A. Correct.

Q. And just so we're clear, these are the stock options, these are different than the five-eighths of 1 percent that we've been talking about. Right?

A. Correct. This was in the parent company.

Q. And similarly then or in addition, you became eligible for the GS long-term incentive program?

A. Mm-hmm.

Page 63

Q. Correct?
A. Yes.
Q. Okay. And then they provided you with tax preparation services. Right?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. And then they have a relocation benefit set forth in the relocation policy. Right?
A. Yes.
Q. On the second page of your offer letter, the second paragraph from the bottom, the last sentence there says "You or the company may terminate your employment, with or without cause, at any time." Do you see that?
A. Correct.
Q. And you understood what that means from a legal point of view is what we call at-will employment. Right?
A. Yes.
Q. Did you have the same arrangement with Siemens?
A. Yes.
Q. And then you signed off on this offer

Page 64

letter. Right?
A. Yes.
Q. And you would agree with me there's no mention in this offer letter of this five-eighths of 1 percent equity that we've been talking about?
A. That's correct. Bob made it very clear that that was not something that he could put in writing in the offer letter at this time.
Q. Did that concern you that he wasn't willing to put it into writing?
A. Yes, but he was very convincing that at the point in time they were at, legally he couldn't do it, but that he -- and he also had Mr. von Reichbauer also confirm that, that they weren't allowed to do that. But obviously they understood that I wouldn't be interested in this position without that equity position.
Q. All right. Then Exhibit 3 is a June 10 letter to you from Mr. von Reichberger. Right?
A. Mm-hmm.
Q. Or von Reichbauer. Correct?
A. Correct.
Q. And apparently you had a follow-up conversation with Mr. von Reichbauer after you

Page 65

received the June 6 letter to clarify a few points. Is that fair to say?
A. Probably.
Q. And so he sends you this letter which he characterizes as an addendum to the offer letter. Right?
A. Correct.
Q. And this talks about a relocation allowance of $10,000 annually for two years. Right?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Okay. And vacation eligibility, you must have asked for additional vacation. Is that right?
A. I don't remember, but could be.
Q. And then it lays out some of the terms of their relocation policy. Right?
A. Yes.
Q. And again in this letter obviously there's no mention of the five-eighths of 1 percent?
A. No.
Q. All right. Let me show you a document marked as Exhibit 4.
MR. CONLEY: John, I'll send these all

Page 66

over.
MR. ARETAKIS: I have them.
BY MR. CONLEY:
Q. Have you seen this document before?
A. I believe I've seen this from the documents that you provided, not -- It wasn't something I had.
Q. And that's something that you had seen?
A. Right.
Q. Okay, you can set that aside then.
Other than the two offer letters that we just looked at, there's nothing else that you received from Mr. Coackley or Mr. von Reichbauer or GSN that you believe sets forth the terms of your employment with the company. Right?
A. Pre-joining?
Q. Pre-joining.
A. Correct.
Q. And there's nothing else that describes or alludes to the five-eighths of 1 percent that you discussed before joining the company?
A. Before joining?
Q. Right.
A. Correct.

Page 135

A. Oh, that I would've had, based on his commitment, at least at a one-year vesting period on my options.
Q. Although his commitment, as I recall, and I guess we go look back, was end of the summer of 1997. Right?
A. Right.
Q. Below that still in the left-hand margin it says "You're not prepared to do it." Am I reading that right?
A. Yeah, not clear.
Q. Not clear. And did I read that right?
A. Yes.
Q. Do you know what that refers to?
A. Uh-uh, no. Sorry.
MR. ARETAKIS: Does that look like "prepared" to you? Doesn't look like "prepared" to me.
BY MR. CONLEY:
Q. Not sure?
A. I'm not sure.
Q. Okay. Go up to the top then in the right-hand, does it say "relied on"?
A. Yes.

Page 136

Q. And then what's the next thing say?
A. "Renege on the deal."
Q. And below that?
A. "Or the home."
Q. For the what?
A. "Or the home."
Q. And then "outrageous behavior"?
A. Behavior, mm-hmm.
Q. Do you recall why you wrote any of those things there?
A. I think at this point in time Bob was upset on the phone and he was yelling about my outrageous behavior, so I just wrote it down.
Q. And then below that "demand," is it "content"?
A. I can't even read my own handwriting.
Q. Okay.
A. I think it says "How can we continue?" I don't know if that was my --
MR. ARETAKIS: "Demand" or "denied"?
A. No, I think it says "demand," but it says "How can we continue," which is I think my comment back to him.
Q. How about below that, "Make" --

Page 137

A. "Promises and renege on them."
Q. Okay. And it looks the right-hand might be cut off a little bit.
A. Yeah, I don't see any more.
Q. Okay.
You resigned on July 15, 1998. Correct?
A. I don't have my resignation letter, but I'm sure.... It sounds close.
MR. CONLEY: Let's mark that.
( Aretakis Deposition Exhibit 22 marked for identification.)
BY MR. CONLEY:
Q. We're showing you what's been marked as Exhibit 22. This is a memo or an e-mail dated 7/15/98 from you to Bob Coackley, subject resignation. Is that your resignation --
A. Correct.
Q. -- memo that you referred to?
A. Mm-hmm.
Q. You refer in the first paragraph to the incident with Bill von Reichbauer today at Westford.
A. Mm-hmm.
Q. What are you referring to there?
A. Bill von Reichbauer came to my facility,

Page 138

the facility I was running in Westford, unknown to me, to have a meeting with those people that worked for me.
Q. That was referred to as a skip level meeting?
A. Yes.
Q. And that's something that had been happening at the various facilities?
A. I think it'd been happening at various facilities but obviously with the general managers.
Q. So your understanding was that the skip level meetings typically included the general managers?
A. Correct.
Q. In the middle, in the second paragraph you kind of recite your various grievances and your various reasons for leaving, and you say in the middle "These same commitments were made to other members of the staff." Do you see that?
A. Correct.
Q. Who are you referring to there?
A. At minimum Jayne.
Q. And you're not sure if there's anybody else?

Page 151

A. Correct.
Q. So was he a franchisee of the ERA outfit?
A. I think so for a period of time, but I think probably for a time it was Boca One itself without ERA.
Q. How did you arrive at the $90,000 figure?
A. That was basically his direct sales income.
Q. Did he become reemployed when you moved to Massachusetts?
A. No.
Q. Why not?
A. He started to build another business.
Q. Did he look for work in Massachusetts?
A. No.
MR. ARETAKIS: Hold on a second.
( Attorney/client conference)
A. I think so but I don't really recall details. You know, it's hard-pressed to ask me about the real estate because I just don't know all the details.
MR. ARETAKIS: Right. If you choose to have a deposition with Chuck Svirk, there is an issue that he had to buy the ERA, which is a

Page 152

national franchise, for either 25 or 50,000 dollars when he moved and had to forgo that. He still owed that debt. So I just wanted you to know that she --
THE WITNESS: Which might be in here. But we probably should get that detail.
MR. CONLEY: Okay.
BY MR. CONLEY:
Q. The losses associated with the vacating of the newly built-out commercial office space, that goes back to the divestiture of the real estate?
A. Correct.
Q. Where does the 77,000-dollar figure come from?
A. This was his investment. He had acquired some space that was rental, that he rented for his offices, but he had built it out, obviously planning to stay.
Q. The loss of business and opportunities for your husband, have you been able to quantify those losses?
A. No. I think it would be better to get him to detail that.
Q. Number 3 is the cost of relocating back to Florida. Do you have any idea of what that cost

Page 153

you?
A. Not off the top of my head.
Q. And you claim here that the move has been disruptive on your children. Did you seek any sort of professional help for your children as a result of the move?
A. No. No.
Q. Do you claim that your children have been harmed in any way by what happened at GSN?
A. No.
Q. Are there any other damages that you're aware of as you sit here today that flow from your treatment at GSX, GSN?
A. No.
MR. CONLEY: Any other damages you're aware of, John?
MR. ARETAKIS: Well --
MR. CONLEY: You've been testifying freely throughout the deposition.
MR. ARETAKIS: Oh, that's not true. I've been much more obstructionist in other depositions. I've sat here quietly.
MR. CONLEY: I believe that.
MR. ARETAKIS: I think her testimony is

Page 154

supplemented by whatever of course is in the complaint, the interrogatory responses, whatever the pleadings have. And also there's that big empty enchilada out there with her husband's testimony about the valuation of properties and his business and the actual costs of moving and that type of thing.
BY MR. CONLEY:
Q. When did you and your husband first marry?
A. February 14, 19 -- I've gotta think -- must be '88.
Q. 1988?
MR. ARETAKIS: I think '89. Just my guess.
MR. CONLEY: Man, you're going to be in trouble if your husband sees this transcript.
THE WITNESS: I know. He's much -- He can tell you all these dates. I can't.
MR. ARETAKIS: Oh, wait a second.
A. I think it was '88.
Q. Valentine's Day?
A. Yeah.
Q. We were married the day before Valentine's Day. Which is great, because I never have to buy a

RECEIVED
JUN 18 1997

GENERAL SIGNAL *Networks*

General Signal Networks
13000 Midlantic Drive
Mount Laurel, NJ 08054

Tel: 609 234-7900
Fax: 609 778-8700

June 6, 1997

EXHIBIT
Aretakis
2
9-23-05 EV

Ms. Eve Aretakis
7070 North East 8th Drive
Boca Raton, FL 33487

Dear Eve:

It is a genuine pleasure to provide you with an offer of employment to join General Signal Networks as Vice President and General Manager of Tautron, our Westford, Massachusetts location. In this position, you will report directly to me.

The compensation plan offered as part of this opportunity includes a weekly salary of $3,365:38 which equates to $175,000. annually. This offer also includes a taxable car allowance of $550.00 per month. In addition, you will be paid a taxable hiring bonus of $40,000. when you begin employment with the company.

You will be eligible to participate in the 1997 General Signal Incentive Compensation Program with a target bonus of 25% of base salary if General Signal Networks meets its 1997 performance targets. You will be credited with a full year's participation in this plan and 50% of this bonus at target will be guaranteed for 1997.

In addition to the GS IC plan, you will be paid an incentive based on Operating Income for Westford Operations as follows: The target for your incentive will be at $45,000 at budgeted levels of Operating Income, with the opportunity to increase the incentive payment in direct proportion to any over achievement in Earnings. You will also be credited with a full year's participation for this incentive.

Regarding stock options, you will be recommended for a grant of 1,000 options subject to approval by the General Signal Board of Directors at the June meeting. Stock Options are to vest over a 4 year period in the amount of 25% per year.

Additionally, you will be recommended for participation in the new General Signal Long Term Incentive Program (LTIP). This plan provides for cash and stock option awards based on recurring three year cycles, with performance measured against financial targets. Your position will provide an award potential targeted at 25% of your base salary paid during the 3 year cycle; with upside potential for performance that exceeds target objectives.

To assist in reporting requirements, we will provide you with tax preparation services for annual tax filing.

EXHIBIT
B

CNT-A 000009

GENERAL SIGNAL
*Networks*

We are also pleased to provide you with relocation benefits as outlined in the attached General Signal Networks, Inc. Relocation Policy. General Signal Networks, Inc. also provides a comprehensive benefits program. A brief summary of our programs is attached. Additional information regarding our benefit programs and effective dates will be provided at your orientation meeting which will be scheduled when you join the company.

This offer is subject to the satisfactory completion of a medical exam and the negative results of a drug screen which may be administered by a physician of your choice in your area. Instructions and related information are enclosed. The cost of this exam and drug screen will be paid in full by the company.

We would like you to bring the following documentation along with you on your first day of work:

- The enclosed Employee Confidentiality and Invention Agreement and Conflict of Interest Questionnaire. These documents require your review and signature.

- The Immigration and Naturalization Service requires documentation to confirm your identity and eligibility to work in the United States. Therefore, please bring along either a passport or driver's license, preferably with your photo, and social security card.

We hope you will have a successful and rewarding career with General Signal Networks. As you are aware, General Signal Networks in common with most companies, does not offer, or ask for, employment commitments for a specified period of time. You or the company may terminate your employment, with or without cause, at any time.

We would appreciate your returning an acknowledgment of your decision. The attached copy of this letter provides a place for your signature and statement of your anticipated date of employment. For your convenience, I've enclosed a return addressed envelope.

GENERAL SIGNAL
*Networks*

Eve, I expect our relationship will be long and mutually beneficial and I look forward to having you as a key member of our senior management team. I am confident you will make a significant contribution as our Vice President and General Manager of our Westford, Massachusetts location and I look forward to working with you in a joint effort to enhance the performance of General Signal Networks-Westford.

Sincerely,

Robert Coackley
President

Accepted: E Aretakis Date: 6/13/97

Start Date: 7/07/97

Not Accepted:______________ Date:______________

GENERAL SIGNAL *Networks*™

General Signal Networks
13000 Midlantic Drive
Mount Laurel, NJ 08054

Tel: 609 234-7900
Fax: 609 778-8700

June 10, 1997

Ms. Eve Aretakis
7070 North East 8th Drive
Boca Raton, FL 33487

Dear Eve:

This letter will confirm our conversations of June 9 concerning our offer of employment for you to join General Signal Networks as Vice President and General Manager of Tautron, our Westford, Massachusetts location. The contents of this letter should be considered an addendum to our offer letter of June 6, 1997. Specific items which we discussed are as follows:

In addition to our standard relocation program, you will be provided a relocation allowance of $10,000. annually for a period of two years to recognize living cost differentials, notably housing and state income taxes, you will experience as a result of your relocation from Florida to Massachusetts. The first allowance will be paid upon your relocation to the Westford, Massachusetts area, with the second allowance being paid one (1) year later.

Your vacation eligibility will be at four (4) weeks vacation per year, commencing with your employment with the company. You had mentioned a previously scheduled vacation commitment of July 28 - August 1 of this year, and that does not appear to create any problems with business operations.

A number of specific arrangements and exceptions to our standard relocation policy will be provided to include the following:

- The company will provide for the shipment of two (2) family automobiles from Florida to Massachusetts.
- Through our relocation management provider (Prudential), we will arrange for a second stop pick-up in Boca Raton to load and transport 2 rooms of office furniture from your husband's office along with your household goods.
- To expedite your relocation and transition to your new responsibilities, we will arrange for suitable temporary living accommodations in the Westford, Massachusetts area. Based on availability, we will arrange to have these ready for your use when you begin work.

EXHIBIT
tabbies
C

CNT-A 000013

Eve, we look forward to your joining us as a key member of our senior management team. I am confident you will be able to make significant contributions in this leadership role, and you can look forward to a long and mutually beneficial relationship. Should you have any questions, do not hesitate to contact me. We look forward to your earliest response.

Sincerely,

William H. vonReichbauer
Vice President
Human Resources

cc: Robert Coackley

Eve C. Aretakis
5 Boardwalk
Chelmsford, MA 01824
508/256-1537

February 9, 1998

Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

Dear Sir or Madam:

In connection with the application of General Signal Corporation ("GSX") for a Private Letter Ruling from the Internal Revenue Service concerning the spin-off of General Signal Networks, Inc. ("GSN"), I am writing to confirm the importance of the spin-off to the long-term performance of GSN. I understand that this letter may be filed with the IRS in support of the ruling request.

Since arriving at GSN in July of 1997, I have served as the General Manager for the facility in Westford, Massachusetts, the home base of GSN's Tautron unit. This is approximately my eighteenth year in the telecommunications industry. My career began at Raytheon Data Systems and Texas Instruments, and I spent the last thirteen years at Siemens Stromberg-Carlson, a unit of Siemens AG. I advanced steadily at Siemens, where I headed the 480-person EWSD (narrowband central office switching) business unit for North America. In that capacity, I worked in the same marketplace as I do now, although our focus was on massive switching equipment for predominantly local telephone companies rather than the test and monitoring products that Tautron offers its mainly long distance customers. Tautron's focus has been in diagnostic and testing products that ensure the provision of quality service, but we have focused our new forays into the burgeoning access business (for the Internet and a host of other data networks). As the General Manager of the Westford facility, I am responsible for manufacturing, development, marketing, business strategy, and overall profit and loss for the Tautron unit. I manage a staff of 190 people.

I was approached by GSN in January 1997, through a recruiter from the Christian & Timbers executive search firm. At the time, I was interested in leaving Siemens because although I had received steady increases in salary, Siemens did not offer its employees an equity stake. I had not heard of GSN and did not find the company's initial contact with me to be compelling. Lacking stock options, GSN struck me simply as a smaller, less well-known Siemens. I did not see any upside without significant stock options. I was considering a generous (but risky) offer from a start-up company when I learned from GSN about the likelihood of a spin-off. As a company about to spin, GSN suddenly became attractive because it was an established operation (unlike the start-up, which had little operating history) and it would be able to provide me with the equity stake I sought.

EXHIBIT
tabbies
D

I walked away from a more generous salary at Siemens for the promise of stock options and a spin-off for several reasons. First, a spin-off will raise GSN's company profile and brand recognition, which will facilitate joint ventures and boost customer confidence. Increased visibility for GSN will indirectly advance my own career. Second, the spin-off will enable GSN to issue options, which is essential to luring and retaining high-tech talent and to making the company's performance easier to gauge. Third, a spin-off will provide GSN senior management with the independence we need to run the business. For example, a spin-off will enable GSN to make its own investment decisions and to make needed acquisitions. For these reasons, which I explain further below, I have great confidence that a spin-off will place GSN in an excellent position to become a substantial player in our rapidly-growing industry.

The high profile that comes with a spin-off is very significant to me for reasons that affect both the company's performance and my own career. At the current time, GSN is a small component of a large, stable industrial company. For this reason, we are not a company that is watched by investment analysts who follow the telecommunications industry. Improved stock performance is a major method by which a company gains publicity. As a company that is not even tracked in the market roundup section of Internet Week (formerly Communications Week), a principal trade paper of our industry, GSN needs to boost its visibility. Such brand recognition will boost the confidence of potential GSN customers and inform potential joint venture partners of the company's existence and attributes. In the telecommunications field, product development often grows out of multi-vendor cooperation on teamed research efforts. Partnering enables businesses with different areas of expertise to join forces in pursuit of new technologies. Since GSN is currently embedded in a company whose work is unrelated to telecommunications, we are little known to many of our potential partners, and they therefore do not see what we could "bring to the table."

As an independent company with its own stock, GSN will derive significant benefit from an increased exposure within its industry by elevating the interest in, and the brand recognition for its products. Even ten years ago, it was all but unheard of to choose a supplier or research partner based on company stock performance, but today this element is a vital factor in instilling public confidence in a company. Favorable stock performance brings publicity that can be leveraged into lucrative contracts and partnerships. That type of "buzz" cannot be replicated with conventional advertisements.

On a personal level, the recognition that I will receive as a consequence of GSN's improved visibility will advance my career and heighten my ability to enhance GSN's profitability. With greater influence in the industry, I will be more valuable to GSN and to any potential future employer.

Another major benefit of a spin-off is its power to unleash GSN's entrepreneurial energy. A GSN that is independent and can offer its own stock or options to its employees will motivate employees to work at optimal capacity because our personal wealth will be affected by individual performance. For me, as I mentioned above, the promise of compensation in equity of GSN was an essential inducement to joining GSN. There is no substitute for a genuine equity stake. The ready availability of options at competing firms will mean that the spin-off will have strong positive implications for the quality of people that GSN can attract. "Shadow" or "phantom" stock plans are not nearly as effective as real options because they do nothing to raise a company's profile (since they are not tracked by market watchers) and because they do not give their recipients the element of ownership that an equity stake confers.

After the spin-off, GSN will be better positioned to take swift action. As an independent company, GSN will be made more deft by jettisoning layers of bureaucracy that slow response time. This independence will foster the sense of urgency that is critical to high-tech companies seeking to advance in a market that relies on the development of promising new products. I was attracted by the opportunities provided by an autonomous GSN, and I know that other talented professionals also seek companies that are dynamic and "hungry." I expect that affiliation with a spirited GSN will enhance my career opportunities down the road.

Such dynamism is currently thwarted at GSN by our inability to take major decisions without approval from above. We are on the cusp of technologies that have the potential to transform networking. GSN product developers are working toward new technologies that blur the distinction between public- and private-market products (respectively, those that serve telephone company networks and those that serve corporations), and an independent GSN will be well-positioned to capitalize on these developments, powered by advances in asynchronous transfer mode and other technologies. If GSN continues to be a part of GSX, we will be less able to take the risks needed in product development and therefore less likely to flourish.

Related to the issue of independence and agility is the need to deploy capital in the manner best suited to the interests of GSN, without the involvement of GSX. In high-tech telecommunications, great synergies can be gained through targeted acquisitions of small but promising companies. Often, a small company can be purchased for only a fraction of what has been invested in it, and the acquisition of small companies enables larger ones (such as GSN) to rapidly gain competence in new areas without spending substantial time developing their own capacity to provide such services. Small start-up companies often have cash-flow difficulties and trouble meeting payroll, so opportunities present themselves in which valuable young companies can be obtained at a bargain price if the acquirer can act quickly. GSX decision-making is slowed by the corporation's many layers, whereas an independent GSN will have the power to seize acquisition opportunities that we have had to forgo under our current structure.

I fully expect to hold a meaningful stake in GSN after the spin-off. If that stake is not forthcoming, I would have no choice but to join a company that can provide me with stock options or at least a salary that better approximates what I earned at Siemens. I left Siemens primarily for the GSN stock options that I anticipate receiving and the visibility they will confer on GSN, and have passed up substantially higher pay at Siemens only because I am confident about the potential of a spun-off GSN.

Sincerely,

Eve Aretakis

# Executive Staff Meeting

February 18, 1998
8:30am to 10:30am
Stonehedge Inn

## Agenda

1. Spin Status
2. Board Recommendations
3. Name Status
4. Roll-Out Plan for GSN Vision
5. 1998 Profit Sharing Plan – Feedback from Eric + Jayne, [illegible]
6. Q1Forecast



# MEMORANDUM

TO: Eve Aretakis

DATE: June 9, 1998

FROM: Jean Santoro
Bill von Reichbauer

COPY: Bob Coackley

SUBJECT: Availability of Bonus and Incentive Plan Earnings

You asked for a statement in respect of the availability of accrued amounts due you as a result of your participation in the General Signal Incentive Compensation Plan and General Signal Networks' incentive program (based on Westford's operating income target achievement) were your employment to terminate prior to December 31, 1998. This statement is for the purpose of clarifying the offset provision of Section 5.b of the Relocation Loan Agreement, dated June 8, 1998, in which we provide that repayment of the outstanding Loan balance, or portion thereof, will be made from accrued bonus and incentive monies due you at the time of your termination.

General Signal Incentive Compensation Plan:

In the Form 10 filed with the Securities and Exchange Commission on May 13, 1998, General Signal Networks included the Form of Employee Benefit Allocation Agreement which delineates the separation of responsibilities between General Signal Corporation and General Signal Networks for employee compensation and benefits following the spin-off ( the "Distribution Date" referred to in the Agreement). Section 4.3 of that Agreement provides that each participant in the GSX Incentive Compensation Plan who is a General Signal Networks employee on the day after the Distribution Date will be entitled to receive an award of earned incentive payable in cash as soon as practicable after the spin-off. Please read Section 4.3 (attached) for a detailed description of the earnings calculation basis.

Under Section 4.3 of the Form of Employee Benefit Allocation Agreement, the award of earned incentive is not tied to continued employment beyond the day after the spin-off. However, it should be noted that once the earned incentive cash pay-out is made to you, such accrued incentive earnings will no longer be available to offset the repayment of the Loan balance.

If the spin-off is not accomplished during 1998, GSX's standard eligibility requirements will continue to apply to the General Signal Incentive Compensation Plan, and GSN is not in a position to control or change them. In that case, accrued incentive amounts will not be available for use in offsetting your repayment obligation.

6. Payment of Cash Awards

Payment of Cash Awards will be made no later than the March 15th of the year following the Performance Period. Cash Awards will be calculated on Actual Base Salary paid for the time the Participant actually participated in the Plan during the Performance Period.

Except in the event of a Change in Control, no vested interest in any payment under the Plan will accrue during the Performance Period. Cash Awards will not be paid to any Participant who resigns or whose employment is terminated, with or without cause, prior to the end of the applicable Performance Period, except to the extent approved by the Chairman, subject to required approvals by the Board (in the case of Cash Awards to officers of the Corporation) or by the P&C Committee (in the case of Cash Awards to unit presidents).

*Exceptions*: Notwithstanding the foregoing, if a Participant terminates due to death, Disability, Retirement, transfer into a position which is ineligible for participation, or for other circumstances approved by the Chairman, the pro rata award amount earned through such event will be paid following the Performance Period in accordance with the Actual Base Salary paid up to the date of such event. If a Participant transfers to a position in another business unit of the Corporation in which he or she remains eligible to be a Participant, the Cash Award will be calculated based on the Participant's Actual Base Salary and by prorating each business unit's EVA for the time the Participant spent in each business unit during the Performance Period.

Participants may elect to defer receipt of Cash Awards, under the Corporation's Deferred Compensation Plan or any successor thereto, to the extent such a plan is in effect from time to time and the Participant is eligible to participate therein under the terms of such plan.

7. Change In Control

If there is a Change In Control of the Corporation, each Participant will become immediately vested in, and entitled to, payment of the Cash Award calculated as (i) the Target Award, multiplied by (ii) the Performance Percentage, as defined in Section 5 above, based upon the Participant's Target Award as in effect immediately before the Change in

General Signal Networks' Incentive Plan:

In the event your employment is terminated prior to December 31, 1998, due to your voluntary resignation or termination by GSN without cause, it is agreed that the accrued earned incentive amounts due you from the following bonus or incentive plans will be made available to offset your outstanding Loan repayment obligation: (a) your specific operating income incentive plan with General Signal Networks and (b) any successor plan to the GSX Incentive Compensation Plan which may be adopted by General Signal Networks for the post-spin 1998 calendar year.

Bill von Reichbauer
Vice President Human Resources

Jean Santoro
Manager, Contracts and Administration

6/9

Bill:
Eve has asked that we state clearly the availability of accrued amounts from incentive programs were she to terminate employment prior to Dec. 31, 1998. I believe the attached properly reflects the GSX program and Bob's intent with regard to GSN's plans. Please review & sign so that we may return it to Eve today & she can complete Prudential transactions. Jean

Case 1:05-cv-10257-DPW Document 28-8 Filed 01/27/2006 Page 1 of 6

Philadelphia Business Journal - December 22, 1997
http://philadelphia.bizjournals.com/philadelphia/stories/1997/12/22/story1.html

PHILADELPHIA BUSINESS JOURNAL

EXCLUSIVE REPORTS
**Business Pulse Survey:** Will the number of employees at your company increase, decrease or stay the same in 2006? Click here to vote

From the December 19, 1997 print edition

## General Signal ready to spin off

John Wilen
Staff Writer

MOUNT LAUREL, N.J. -- General Signal Networks, a $210 million locally based operating unit of a Connecticut industrial giant, will be spun off into a stand-alone company within the next six months, the companies said.

General Signal Corp. of Stamford, Conn., said it will spin off General Signal Networks because it does not fit well with its core engineered industrial products businesses.

"GS Networks is financially attractive," said the company in a recent statement. "It is, however, a high-technology business, and the ability of General Signal to add value to this business is limited."

"Assuming market conditions are right, General Signal expects to spin off GS Networks in the middle of 1998," the statement continued.

Company officials this week confirmed the plan.

GS Networks was formed in 1995 when General Signal bought two companies -- Mount Laurel-based Telenex Corp. and Data Switch Corp. of Shelton, Conn. -- and combined them with its Westford, Mass., Tautron subsidiary. At that time, General Signal Networks had 1,000 employees and annual revenues of $210 million.

GS Networks makes a variety of products for data and telecommunications networks, including high-speed switching systems, testing, monitoring and management systems, and data center connectivity systems. The company's core products let its customers in the financial, business service, transportation and telecommunications industries quickly locate and fix problems with their telecommunications networks.

The GS Networks business differs dramatically from that of most other General Signal units, which make products ranging from process control devices -- valves and pumps -- to uninterruptible power supplies and bicycle components.

"We like businesses which manufacture engineered industrial products," General Signal said in its statement. The characteristics of such businesses include "products that are engineered or configured to order," and "industrial customers," the statement said.

"The business in our portfolio which most obviously does not meet these criteria is GS Networks," the statement continued.

As part of an industrial company, the statement said, "GS Networks has difficulty recruiting people. ... This

spinoff should unlock value for both companies and make it easier for our shareholders to make informed judgments about holding this part of the General Signal portfolio."

GS Networks spokesman Alex Nagy said this week that figures released at the time of GS Networks' formation were still "current" and "relevant."

In 1995, the Mount Laurel headquarters of GS Networks employed 355 and generated $75 million in revenues. The Shelton, Conn., facility employed 440 and generated $90 million in revenues, and the Westford, Mass., office employed 105 and generated $45 million in revenues.

The industrial technology division of General Signal Corp., of which GS Networks is a part, generated $367.3 million in revenues last year. Nagy declined to say what portion of those revenues came from GS Networks. The industrial technology division contains two other units, GFI Genfare, an Illinois company that makes mass transit fare systems and vending machines, and Metal Forge, an Ohio company that makes bike components.

Nagy declined to disclose updated figures, saying the company will do so only when it announces the spinoff. Robert Coackley, president of GS Networks, declined comment, citing Securities and Exchange Commission quiet period rules that govern pending stock offerings.

General Signal Corp. analysts contacted for this story were generally unaware of the plan, which was mentioned deep in a statement concerning a different matter.

In the same statement, General Signal announced plans to sell three other unnamed units next year, which generate total revenues of $150 million. Following the spinoffs, the company expects to report $1.3 billion in annual revenues, the statement said.

Last year, General Signal's revenues were $2.07 billion.

*© 1997 American City Business Journals Inc.* XML **Add RSS Headlines**

**Become an Edward Jones Investment Representative.** Edward Jones
Run your business.
Determine your compensation.
Create your future.
Apply today.

» **View all jobs from this company**

**Today's Featured Jobs** powered by **bizjournalsHire**

- TELEMARKETING Philly Direct - Philadelphia Direct
- Purchasing Manager/Food Service - Center City Phil - ARAMARK
- LOAN DOCUMENTATION REP 2 - Wells Fargo
- Systems Analyst - Sai People Solutions, Inc.
- Entry Level Medical Sales Representative - Concentra

More Local Jobs

→ **Post Jobs** | → **Post Your Resume** | → **Search Jobs**

*All contents of this site © American City Business Journals Inc. All rights reserved.*

networks News
An employee newsletter
sharing information, news & successes.

Letter from the President
Update on Spin-off
Business Results
Company Name

Rec'd 7/6/98

*Update on Spin-off*

The proposed spin-off of General Signal Networks as a separate public corporation is progressing quite well. Our registration document, formally known as a Form 10, was filed with the Securities and Exchange Commission (SEC), and additional information was filed with the IRS. We are awaiting their rulings, after which the General Signal Corporation Board of Directors is expected to declare the effective date of the spin-off. Although we have been working toward a July 1 spin date, we decided to delay the date approximately a month so that second quarter results will be available. * We have now completed our search for candidates who will make up the Board of Directors for our new company, and I am delighted that we have received acceptances from six external directors, all of whom are outstanding individuals with experience that will be of great benefit to us all. The Board will consist of these six external directors and myself as Chairman, giving a board complement of seven.

*Business Results*

The first quarter ended with us being behind plan on our business results. Although, we made up some of the ground in April and May. There are additional major programs in place designed to bring in business during June and the second half of the year. These efforts, combined with some judicious expense curtailment, should help us to have a favorable second quarter and a good year. I ask all of you to do your part in making these programs successful.

*Company Name*

We continue to be frustrated by the difficulty in selecting a new name. In the last newsletter, I stated it was my hope we would have one in the next 30 days. To say I was overly optimistic might be considered an understatement! The main problem is that with the explosive growth of the Internet, thousands of companies have sprung up (world-wide), and they all register in the same networking classification to which we belong. Consequently, the testing of names is tedious and most suggested names fail. In any event, we are continuing the selection process diligently. Rest assured, we will not be called NNN (No Name Networks)!!!

Along with my colleagues in the executive team, I hope you all have a good summer.

Regards



# Recruiting Out-of-the-Box

*By Monica McClintock,*
*Senior HR Administrator, Mount Laurel*

If you are wondering what *"Recruiting Out-of-the-Box"* means, it is utilizing many new, creative and "out-of-the-ordinary" techniques to fill our job openings in this challenging job market that currently exists. It is looking beyond the traditional ways of doing things that are costly and [illegible] such as running expensive newspaper ads for engineering openings.

As many of you have heard, there is a widespread shortage of skilled workers in the high-technology and [illegible] fields. For example, the current unemployment rate for electrical engineers is 0.4%.

This shortage has been well-documented by industry groups such as the Information Technology Association of America and the American Electronics Association (AEA). Non high-tech companies are also feeling the shortage squeeze. The National Association of Manufacturers, the U.S. Chamber of Commerce, and the National Federation of Independent Business all report that their member companies are also finding it harder to hire qualified [illegible]

Between fixing the Year 2000 problems and meeting new high technology demands, U.S. high-tech workers of all ages are in demand. Microsoft Corporation, for example, grew from 5,635 employees in 1990 to 22,232 in 1997. In the same time period, Compaq Computer Corporation expanded from 11,400 employees to 32,656. The U.S. Department of Labor projects that 1.3 million jobs will be created over the next decade in information technology. The Bureau of Labor Statistics estimates that demand for computer engineers will jump to 109% between 1996 and 2006. According to the U.S. Bureau of Labor Statistics, the demand for database administrators, computer support specialists and computer scientists is expected to increase by 118%. For computer engineers, 109%; for systems analysts, 100%.

To contribute to this deficiency, technical education has also been on a major decline. According to AEA, between 1985 and 1997, the number of bachelor's degrees awarded in the U.S. decreased in the following proportions:

Unfortunately, high school and elementary school students do not show promise of reversing these trends. The Third International Math and Science Study, released February 1998, ranked the U.S. 19th out of 21 countries in math skills of 12th grade students, and 16th out of 21 countries in science skills. Some industry leaders say that the reason for this declining rate is because young Americans are turning away from what they see as demanding and boring work, the cornerstone of the computer revolution. To turn this around, it is vital that our families, educators and employers enlighten our young people to the challenging and rewarding career opportunities in these technical fields; a profession that will only grow and become more challenging as time moves forward.

Due to this labor shortage, many companies, such as General Signal Networks, have been "**Recruiting Out-of-the-Box**" - turning to many new and creative ways to fill the gap. One method being utilized to place technical talent in firms is to recruit abroad through the H-1B visa process. The H-1B allows companies to hire foreign professionals on a temporary basis for up to six years.

In March, representatives from our Shelton and Mount Laurel offices ventured to India and Ireland to identify talent for the multitude of software, hardware and firmware engineering openings currently in demand to fill critical development needs. It proved to be a very successful trip and several talented engineers were identified and provided with offers which included H-1B visa sponsorship.

The U.S. has an arbitrary cap on the number of H-1B visas each year; approximately 65,000 each year. This visa is not just for high-tech organizations, but for every industry. Many H-1B"s are granted to those in the music and modeling business. The H-1B visas have reached their cap for the fiscal year and many high-technology companies are urging Congress to substantially raise the number of work visas for highly skilled foreign, technical workers to fill immediate high-technology demands. There are two bills pending in that would raise the cap considerably. With many high-tech firms coming forward to urge Congress to raise the cap, suddenly, the labor shortage itself is being challenged by labor groups, etc. Foreign workers are sometimes blamed for taking jobs from Americans by accepting lower wages. Other critics believe that the entire high tech industry invented the labor shortage in order to replace higher paid American workers with low-paid foreign workers. However, information from the National Sciences Foundation shows that foreign-born scientists and engineers on average, earn more, not less, than their U.S.-born counterparts. This is primarily due to their multiple language capability that can help some companies break into new global markets. Additionally, there are legal complaint mechanisms in the H-1B regulations that prohibit the payment of wages below prevailing rates. General Signal Networks is committed to competitive offers to all hires, foreign-born or not, as well as competitive wages for our employees.

With all of this controversy, the shrinking number of technically-minded American students, and the growing number of skilled foreign workers, is at the heart of the immigration debate in Congress. The fact remains that the high-tech labor shortage is a reality and it affects a variety of companies nationwide, including manufacturing, pharmaceuticals and education.

General Signal Networks recognize that as valuable as these H-1B workers are, they are only a temporary solution

improve our communications around career development, encourage greater utilization of our terrific tuition reimbursement program, better educate our young people, partner with our local high schools and universities and reach out to improve this critical situation we are faced with.

*We continue to encourage and welcome employee referrals for all of our openings. **Please note that the Mount Laurel award program, which was temporarily increased for engineering hires to $2,500, will remain in effect until September 1, 1998.***

As we await the arrival of our newly hired engineers, remember that in today's global economy, a diverse workforce of very talented and dedicated employees, working as a team and meeting the strategic goals of our organization, is absolutely necessary for success. When these individuals arrive, they will be your new colleagues who will depend on your guidance as they transition into a new company and a new country. They are very anxious to join us in Mount Laurel and Shelton and to work with each and everyone. Not only are we lucky to work with such fine people here at GS Networks, but this is a great, culturally rich organization of which to be proud.

# Teamwork and Team Training at GSN

*By Bob Powell, Instructor*
*Knowledge Resources, Inc.*

Part of Bob Coackley's vision for GSNetworks as it becomes an independent company is that is has a highly developed [illegible] both intra and inter-divisional.

[illegible] Knowledge Resources, Inc. has been [illegible] training programs to support that [illegible]

Teams benefiting from this training include:

- New product development process selection
- MIS systems selection
- Job Opportunity survey team
- NCOE Team from Westford
- Multi-divisional product strategy teams
- Fibre-optic virtual team

In early February, a notable event took place at one of the [illegible] sessions in Shelton. Incorporated into the training [illegible] simulation called "Corporate Juggling." The exercise [illegible] business planning and process management [illegible] involving the tossing of tennis balls, golf balls, and eggs. This exercise has been run many times in some very sophisticated companies. The team in Shelton achieved the highest score ever recorded - a very exciting moment. They eclipsed the record set by the sales force of a specialty optics company in Southern California set a year ago —

*CONGRATULATIONS!*

## Teamwork Members:

**Phil Benoit**
**Paulette Brachman**
**Dale Collins**
**Jim Corrigan**
**Don Dezenzo**
**Ellen Hogan**
**Debbie MacIntyre**
**Bob Mazzucco**
**Debbie McSperrin**
**Dave Miller**
**John Nagy**
**Cliff Oberholtzer**
**Bill Pace**
**Keith Phillips**
**Pete Primerano**
**Bill Sabia**
**Maura Satkowski**
**Bryan Swanson**
**Elaine Weiant**
**Mike Williamson**

improve our communications around career development, encourage greater utilization of our terrific tuition reimbursement program, better educate our young people, partner with our local high schools and universities and reach out to improve this critical situation we are faced with.

***We continue to encourage and welcome employee referrals for all of our openings. Please note that the Mount Laurel award program, which was temporarily increased for engineering hires to $2,500, will remain in effect until September 1, 1998.***

As we await the arrival of our newly hired engineers, remember that in today's global economy, a diverse workforce of very talented and dedicated employees, working as a team and meeting the strategic goals of our organization, is absolutely necessary for success. When these individuals arrive, they will be your new colleagues who depend on your guidance as they transition into a new company and a new country. They are very anxious to join us in Mount Laurel and Shelton and to work with each and everyone. Not only are we lucky to work with such fine people here at GS Networks, but this is a great, culturally rich organization of which to be proud.

# Teamwork and Team Training at GSN

*By Bob P[illegible], Instructor*
*Knowledge [illegible], Inc.*

Part of B[illegible]'s vision for GSNetworks as it becomes an inde[illegible] is that is has a highly developed s[illegible] and inter-divisional.

[illegible] Knowledge Resources, Inc. has been [illegible] training programs to support that [illegible]

Teams [illegible] training include:

- New [illegible] development process selection
- MIS systems selection
- Job Opportunity survey team
- NCOE Team from Westford
- Multi-divisional product strategy teams
- Fibre-optic virtual team

In early February, a notable event took place at one of the te[illegible] Shelton. Incorporated into the t[illegible] "Corporate Juggling." The e[illegible] planning and process management e[illegible] tossing of tennis balls, golf balls, and eggs. [illegible] been run many times in some very sophistic[illegible]ies. The team in Shelton achieved the highest score ever recorded - a very exciting moment. They eclipsed [illegible] by the sales force of a specialty optics company in Southern California set a year ago —

[illegible]

## Teamwork Members:

- Phil Benoit
- Paulette Brachman
- Dale Collins
- Jim Corrigan
- Don Dezenzo
- Ellen Hogan
- Debbie MacIntyre
- Bob Mazzucco
- Debbie McSperrin
- Dave Miller
- John Nagy
- Cliff Oberholtzer
- Bill Pace
- Keith Phillips
- Pete Primerano
- Bill Sabia
- Maura Satkowski
- Bryan Swanson
- Elaine Weiant
- Mike Williamson

Not Reported in N.E.2d
Not Reported in N.E.2d, 19 Mass.L.Rptr. 277, 2005 WL 1009523 (Mass.Super.)
**(Cite as: 2005 WL 1009523 (Mass.Super.))**

Superior Court of Massachusetts.
**Webert MONTLOUIS**
**v.**
**PIRUS NETWORKS, INC. et al.**
**No. 025364.**

March 15, 2005.

*MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

RALPH D. GANTS, Justice.

*1 The plaintiff Webert Montlouis ("Montlouis") has filed a second amended complaint against his former employer, the defendant Pirus Networks, Inc. ("Pirus"), and its Executive Vice President of Technology, defendant Richard Corley ("Corley"), alleging that Pirus and Corley:

1. terminated him and subjected him to a hostile work environment because of his race and national origin, in violation of G.L.c. 151B, § 4(1);

2. retaliated against him after he orally complained to his supervisor, Douglas Wood ("Wood"), Pirus's Vice President of Engineering, that the proposed promotion of Paul Sweeney (a white engineer) would be unfair, in violation of G.L.c. 151B, §§ 4(4);

3. breached Pirus's oral agreement to employ him for four years and to grant him stock options in Pirus;

4. breached its implied-in-fact contract with him by wrongfully discharging him and refusing to grant him stock options;

5. breached the implied covenant of good faith and fair dealing by terminating him before the promised stock options had vested;

6. wrongfully terminated him because of his race and national origin, in violation of public policy;

7. negligently inflicted emotional distress upon him through its discrimination; and

8. were unjustly enriched at his expense.

The defendants have moved for summary judgment as to all of plaintiff's claims. After hearing, for the reasons detailed below, the defendants' motion for summary judgment is *ALLOWED* as to all of plaintiff's claims.

*BACKGROUND*

In evaluating a motion for summary judgment, this Court must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the nonmoving party. *Beal v. Board of Selectmen of Hingham,* 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to Montlouis and should not be misunderstood as findings of the Court.

Pirus was a start-up corporation formed to create, design, and market an Internet Protocol storage networking system known as a Storage Utility Switch. Montlouis was hired by Pirus to join its technical staff as a senior level designer and commenced work on May 7, 2000. Montlouis obtained his job interview at Pirus through Logix, an employment placement firm, and interviewed with Corley, Wood, and Brian Schofer. Wood made the decision to hire Montlouis based, in part, on Corley's recommendation. In Corley's interview with Montlouis, Corley told Montlouis that Pirus would proceed to an initial public offering and would not be sold to another company. Corley said Montlouis would be employed by Pirus for at least four years, and then would receive equity in Pirus under its 2000 Stock Option Plan, which provided for a four-year vesting period for those options.

On or about April 19, 2000, Pirus made Montlouis a written offer of employment, which provided for $110,000 in annual salary, a signing bonus of $7,500, and an option to purchase 28,000 Pirus shares through participation in its Stock Option Plan. Wood separately agreed to establish a tuition reimbursement program for Montlouis. The written offer of employment explicitly provided that Montlouis' employment would be at-will, stating, "Your employment with Pirus Networks is entirely voluntary for both parties and either you or Pirus Networks may conclude the employment relationship at any time for any reason." The Stock Option Plan referenced in the written offer of employment also made clear that it should not be understood as a promise of continued employment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



In the first sentence of paragraph 9, it declared:

*2 Nothing contained in the Plan or this Agreement shall be construed or deemed by any person under any circumstances to bind the Company to continue the employment of the Employee for the period within which this Option may be exercised, nor shall the Plan or this Agreement create any duty of the Company or any of its affiliates or other shareholders to the Employee, comparable to the duties which partners or joint venturers may owe to each other.

Montlouis accepted the offer of employment in writing on April 24, 2000.

When Montlouis began his employment, Pirus had 38 other employees; Montlouis was the only black employee. When Montlouis' employment was terminated, Pirus had grown to 121 employees, but Montlouis remained the only black.

The Storage Utility Switch that Pirus was created to design and market allows computers using various storage protocols to connect with storage devices from different vendors. The primary hardware components of the Storage Utility Switch are a Storage Resource Card and a Switch Fabric Card. A key component of the Storage Resource Card is a Direct Memory Access ("DMA") chip. As a senior level designer, Pirus assigned Montlouis the overall responsibility to design and program the DMA chip. To successfully design the DMA chip, Montlouis needed to program it to pass information to the Queue Manager. By early October 2000, Montlouis reported to Wood that he was 90% completed in programming the base functionality of the DMA chip. To determine if Montlouis had successfully programmed the DMA chip, it had to be "debugged," which could not occur until Pirus received the Storage Resource Card on which the DMA chip was to sit, which did not occur until November 2000. Once the de-bugging of the DMA began, it became apparent that the DMA could not communicate information with the Queue Manager. The reason was that, based on the instructions he had been given by Corley and Wood, Montlouis had programmed the DMA chip to support "burst" transactions but the Queue Manager could only support "single-beat" transactions. [FN1] Consequently, the DMA chip needed to be redesigned to support "single-beat" transactions. Corley and Schofer were assigned to assist Montlouis in this effort, which was given the name "Thunderdome" and completed in roughly three weeks. The magnitude of this error and the remedial action required was unprecedented at Pirus. Because Corley and Schofer needed to be shifted to work on "Thunderdome," they were unavailable to work on their own projects for the Storage Utility Switch, which pushed the project even further behind.

FN1. Pirus denies that Montlouis had been instructed to program "burst" instructions and contends that Montlouis' failure to determine that the DMA chip needed to be programmed to support "single-beat" transactions was unacceptable job performance.

After "Thunderdome," Montlouis was given further tasks to perform on the DMA chip. Pirus developed a schedule for the completion of these tasks. Montlouis eventually completed these tasks but all were completed behind schedule. Montlouis was not the only Pirus engineer to be late in completing his tasks; Corley and Paul Sweeney were equally or more late on many of their tasks.

*3 In or around August 2000, roughly three months after Montlouis began work with Pirus, Wood considered promoting Sweeney to a new position--Director of Component Engineering. Wood did not consider Montlouis for this position because he thought that Sweeney was more senior and more appropriate for the position than Montlouis. In keeping with his normal practice when he considered an employee for promotion, Wood asked several Pirus engineers, including Montlouis, what they felt about the proposed promotion for Sweeney. When Wood asked Montlouis, he paused, thought about it, and told Wood he would get back to him tomorrow. Wood acknowledged in speaking with Montlouis that Montlouis had more experience in chip design and verification than Sweeney, and that Montlouis was probably asking why it was not him being considered for the promotion. The next morning, Montlouis told Wood "that it would be unfair to me, that [sic] basically would affect me at Pirus." Sweeney ultimately did not get this promotion. Wood later told Montlouis that other persons also had concerns with Sweeney. Montlouis does not allege that Wood discriminated against him on the basis of his race or national origin in not considering him for this promotion. Indeed, Montlouis testified in his deposition that he did not believe Wood ever discriminated against him on the basis of either his race or national origin.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Montlouis contends that the hostile work environment began after he was assigned to work on the DMA chip in July 2000 and continued until his termination. In describing why he believed the work environment had been hostile, he declared that he was never treated as part of the "Corley Crew" of white engineers. Corley, Wood, Sweeney, and Schofer acted differently towards each other than toward Montlouis. He noted that Corley gave him the "cold shoulder," asked him questions in a "strange" manner, and did not say "hi" to him as often or take him out to lunch as often as he used to. He also notes that Schofer did not share information with him about the problem with the Memory Controller, but had told other white engineers about the problem. Montlouis also was upset about what he characterized as the "sabotage" of his work, which was actually the copying and revision of his computer files without his knowledge or permission when he was absent from work. William Watts, Pirus's Director of Hardware Engineering, was aware of the copying and revision of Montlouis' computer files, but testified that this was not intended to sabotage Montlouis' work but to allow the design team to continue to work in Montlouis' absence on DMA chip development.

Montlouis also testified that a talk radio station was left on in the laboratory during the day and, on one occasion, the radio announcer said that all immigrants should go back home. Corley and the others in the room were laughing and joking about the statement. Montlouis testified to another incident, which occurred around May 2001. While he was returning from lunch with Corley and Sweeney, Sweeney asked him what he was going to do with all the money when Pirus "makes it," "buy a big gold chain like Mr. T?" Both Corley and Sweeney laughed at this question. These two incidents were the only comments he ever heard at Pirus that concerned his race or national origin.

*4 Throughout his employment with Pirus, Montlouis never suffered a decrease in salary, was never given assignments that were inappropriate for a person with his background and experience, never stopped being invited to weekly hardware group meetings, and never stopped interviewing prospective employees.

In the summer of 2001, Pirus reviewed the performance of each of its engineering employees to determine who, if anyone, was not performing adequately. These reviews were based strictly on performance and were not part of a planned reduction in force. Three employees were determined to be performing below expectations--Montlouis, a white male, and a white female. Each were terminated. Although Corley was asked his opinion as to whether Montlouis should be terminated, Wood was solely responsible for the termination decision. Montlouis was terminated on July 27, 2001. After his termination, his work was performed by multiple persons, but Schofer was the engineer primarily responsible to carry the design forward.

*DISCUSSION*

To prevail on summary judgment, the moving party must establish that there are no genuine issues of material fact as to any element of a claim and that it is entitled to judgment as a matter of law on that claim. See Mass.R.Civ.P. 56(c); *Highlands Insurance Co. v. Aerovox, Inc.*, 424 Mass. 226, 232 (1997). Where, as here, the party opposing summary judgment has the burden of proof at trial, the moving party is entitled to summary judgment if it "demonstrates, by reference to material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case." *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991). "To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party's claim." *Id.* It is sufficient to demonstrate that "proof of that element is unlikely to be forthcoming at trial." *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 809 (1991) .

Since each of Montlouis' claims raise separate issues, this Court will consider each claim in turn.

1. *Race and National Origin Discrimination: Termination*

In evaluating whether a discrimination claim under Chapter 151B survives summary judgment, Massachusetts courts use the same three-stage analysis originally devised by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) to address Title VII discrimination claims. *Wynn & Wynn, P.C. v. Massachusetts Commission Against Discrimination,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

431 Mass. 655, 665 (2000); *Blare v. Husky Injection Molding Systems Boston, Inc.,* 419 Mass. 437, 440 (1995). In the first stage, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. *Blare,* 419 Mass. at 441. Once the prima facie case is established, the plaintiff enjoys a presumption of discrimination that entitles the plaintiff to judgment unless and until the defendant rebuts the presumption "by articulating a legitimate, non-discriminatory reason for its [termination] decision." *Id.* Once the defendant satisfies this burden of production, the presumption vanishes, and the plaintiff bears the burden of persuasion at the crucial third stage to establish either that the employer's articulated reason was a pretext or that the actual reason for the termination decision was discrimination. *Id.* at 444.

***5** In a traditional employment discrimination case, as here, where the plaintiff has been terminated and the discrimination case rests on circumstantial evidence, the first stage showing of prima facie discrimination generally is satisfied by proving four elements:

1. the plaintiff belongs to a class that is protected by G.L.c. 151B;
2. he performed his job acceptably;
3. he was terminated; and
4. his employer sought to fill the plaintiff's position by hiring another individual with qualifications similar to the plaintiff's.

*Id.,* at 441; *Wynn & Wynn, P.C.,* 431 Mass. at 665.

Applying those four elements here, Montlouis plainly belongs to a protected class and he was certainly terminated. While Pirus vigorously contends that Montlouis did not perform his job acceptably, there remains here, as in virtually every employment discrimination case, a genuine issue of material fact as to whether Montlouis' work performance was acceptable. Given the technical nature of the work that Montlouis performed, his contention that he was instructed to program the DMA chip to support "burst" transactions, his ultimate completion of the work he was given, and disputes in the record as to whether his work was more behind schedule than other engineers who were not fired, this Court cannot find as a matter of law that Montlouis' work performance was unacceptable. As to the fourth element, while the record is clear that no new employee was hired to replace Montlouis, there is evidence that his work was performed by other engineers, primarily Schofer, who had qualifications similar to Montlouis.

Therefore, viewing the evidence in the light most favorable to Montlouis, there is a genuine issue of material fact as to whether Montlouis may prove his prima facie case.

Pirus, however, has articulated a legitimate, non-discriminatory reason for its decision to terminate Montlouis--that it believed he was not meeting his performance expectations. With Pirus having furnished this explanation, this Court, in deciding this summary judgment motion, must determine whether Montlouis has any reasonable expectation of proving that this articulated reason was a pretext or that the actual reason for the hiring decision was discrimination. See *Kourouvacilis v. General Motors Corp.,* 410 Mass. at 716; *Blare,* 419 Mass. at 444. This Court finds that, even viewing the evidence in the summary judgment record in the light most favorable to Montlouis, he does not have any such reasonable expectation.

The fatal flaw in Montlouis' discrimination claim regarding his termination is that there is no dispute that Wood was responsible for the decision to terminate and Montlouis concedes that Wood never discriminated against him on the basis of either his race or national origin. Wood attests that he based his termination decision on Montlouis' failure adequately to design and program the DMA chip and to complete in a timely fashion the various tasks assigned to Montlouis after the completion of the Thunderdome project. While Wood solicited the opinions of other Pirus employees, including Corley and Watts, in reaching this decision, there is no evidence that he was provided with false or misleading information regarding Montlouis' performance by anyone that Wood relied on in reaching his judgment of Montlouis' performance. Compare with *Cariglia v. Hertz Equipment Rental Corporation,* 363 F.3d 77, 85-86 (1st Cir.2004) (discrimination may be found when the termination decision is made by individuals without discriminatory animus who relied on false or misleading information provided by the plaintiff's supervisor, who bore such animus). Indeed, Wood was Montlouis' direct supervisor and had personal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

knowledge regarding Montlouis' performance. While one reasonably may differ with his appraisal of Montlouis' performance, Montlouis agrees that Wood did not act with any discriminatory intent. Therefore, summary judgment must be granted as to Montlouis' claim that his termination was caused by race or national origin discrimination.

2. *Race and National Origin Discrimination: Hostile Work Environment*

*6 Montlouis claims that he was harassed and discriminated against on the basis of his race and national origin in the conditions of his employment through the creation of a hostile work environment. "A hostile work environment is one that is 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.' " *Cuddyer v. The Stop & Shop Supermarket Company,* 434 Mass. 521, 532 (2001), quoting *College-Town v. Massachusetts Commission Against Discrimination,* 400 Mass. 156, 162 (1987). See also *Gnerre v. Massachusetts Commission Against Discrimination,* 402 Mass. 502, 507-08 (1988) (sexual harassment, to be actionable, must be sufficiently pervasive to alter the conditions of the victim's employment). To prevail on this claim, Montlouis must show not only that he suffered harassment that made his employment significantly less desirable to him, but also that the harassment "was of such a nature that it would make the plaintiff's [employment] significantly less desirable to a reasonable person in the plaintiff's position." *Gnerre,* 402 Mass. at 506-07.

Even viewing the evidence in the light most favorable to Montlouis, there is not sufficient evidence in the summary judgment record to permit a finding that Montlouis' work environment was so "pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization," that it made Montlouis' employment significantly less desirable to a *reasonable person* in his position. See *Cuddyer,* 434 Mass. at 532; *Gnerre,* 402 Mass. at 506-07. From Montlouis' testimony, one arguably can infer that *he* found it to be a hostile work environment, but that does not necessarily permit a reasonable inference that a *reasonable* person in his position would have found it to be so. When one looks closely at the evidence that Montlouis has proffered in support of his claim of a hostile work environment, one finds, as Gertrude Stein said of Oakland, that "there is no there there."

The only comments about his race and national origin that he can point to were:

laughter and joking by his fellow engineers at a talk radio announcer's statement that all immigrants should go home; and

a fellow engineer (Sweeney) asking him whether he was going to "buy a big gold chain like Mr. T" with the money he would earn if Pirus "makes it."

As to the former, the statement by the radio announcer was certainly not directed at him, and Montlouis does not even allege that his fellow employees focused on him once the statement was made. Nor does he allege that anyone supported this inane statement; he simply testified that they laughed and joked about it. As to the latter, the question was asked when he, Sweeney, and Corley were returning from lunch, and nothing more was ever said about it. Such comments, at worst, fall into the category of stray remarks that, by themselves, cannot suffice to establish a hostile work environment. See generally *Clark County School District v. Breeden,* 532 U.S. 268, 271 (2001) (simple teasing, offhand comments, and isolated incidents, unless extremely serious, do not create a hostile work environment); *Wynn & Wynn, P.C.,* 431 Mass. at 667.

*7 Nor would a reasonable person have found Montlouis' work environment to be hostile when one considered his contention that he was not part of the "Corley Crew" of engineers. The fact that the "Corley Crew" were all white engineers means little, since Montlouis was the only black employee and there were only a handful of Asian employees during his employment. In essence, the only evidence that Montlouis can muster is that he was not treated as warmly by Corley as other engineers and was not among those who were personally close to him. This can hardly support a hostile environment claim, especially when one considers that Corley recommended that Montlouis be hired following his interview, presumably knowing that Montlouis was a black Haitian. See *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 847 (1st Cir1993), cert. denied, 511 U.S. 1018 (1994) (strong inference that person responsible for hiring plaintiff is unlikely to discriminate against him shortly thereafter).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Nor, upon closer scrutiny, does the most serious allegation--"sabotage" of Montlouis' work--rise to the level of hostile environment discrimination. What Montlouis characterized as "sabotage" was simply other engineers on the design team using his computer to copy and revise his computer files so that they could continue to work in Montlouis' absence on DMA chip development. While it would have been more polite to have asked him for permission or to have told him that they had revised his files, this conduct, even considered in conjunction with the other alleged conduct, is not sufficient to constitute the pervasive hostile environment that reasonably may be viewed as altering the conditions of Montlouis' employment. In short, the evidence in the summary judgment record, even when viewed generously and cumulatively, would not permit any reasonable factfinder to conclude that a reasonable person in Montlouis' position would have considered his fellow employees' conduct to be pervasive racial or national origin harassment and abuse that made the workplace a hostile environment. Therefore, summary judgment must be granted as to Montlouis' claim that he suffered race and national origin discrimination through a hostile work environment.

3. *The Claim of Retaliation*

"To establish a prima facie case of retaliation, a plaintiff must show that he engaged in legally protected conduct; he suffered an adverse employment action; and a causal connection existed between the protected conduct and the adverse action." *Mole v. University of Massachusetts,* 58 Mass.App.Ct. 29, 39 (2003). The legally projected conduct must involve the plaintiff's opposition to a practice forbidden under Chapter 151B. *Id.* at 40; G.L.c. 151B, § 4(4). Phrased differently, to succeed on a claim for retaliation in violation of G.L.c. 151B, a plaintiff must prove: (1) that he believed in good faith that his employer was engaged in wrongful discrimination; (2) that he acted reasonably in response to his belief; and (3) that the employer's desire to retaliate against him was a determinative factor in an adverse employment decision. *Tate v. Dept. of Mental Health,* 419 Mass. 356, 364 (1995).

*8 Here, Montlouis' claim of retaliation is based solely on his comments to Wood regarding Wood's proposal to promote Sweeney. According to Montlouis, when Wood asked him how he felt about the promotion, he told Wood "that it would be unfair to me, that [sic] basically would affect me at Pirus." Montlouis admits that he does not allege that Wood discriminated against him on the basis of his race or national origin in failing to consider him for this promotion, so Montlouis' objection to Sweeney's promotion could not have been intended (or reasonably understood) to mean that Montlouis was telling Wood that he believed that Sweeney was being promoted over him because of his race or national origin. In short, Montlouis did not believe that Wood was engaging in discrimination in seeking to promote Sweeney, so his objection to that promotion cannot form the basis of a retaliation claim. There is no cause of action under G.L.c. 151B for retaliating against an employee for objecting to someone else's promotion when that objection is not based on a claim of discrimination. Moreover, Montlouis has no reasonable expectation of proving that his objection to Sweeney's promotion, an objection which was shared by others and ultimately resulted in Sweeney not obtaining the promotion, was the motivating cause of any adverse employment action against him. Therefore, summary judgment must be granted on this spurious claim of retaliation.

Since the defendants are entitled to summary judgment as to all the claims brought under G.L.c. 151B, they are also entitled to summary judgment on the common-law claims that rest on the allegation of racial or national origin discrimination, or retaliation. *Dziamba v. Warner & Stackpole, LLP,* 56 Mass.App.Ct. 397, 409 (2002). Therefore, the defendants shall be granted summary judgment on Montlouis' claims of wrongful termination based on discrimination and negligent infliction of emotional distress.

4. *Claims of Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing*

This Court need not dwell long on Montlouis' claims that his termination breached his contract with Pirus or the covenant of good faith and fair dealing implicit in every contract. The agreement that Montlouis signed when he commenced his employment with Pirus explicitly provided that Montlouis' employment would be at-will, stating, "Your employment with Pirus Networks is entirely voluntary for both parties and either you or Pirus Networks may conclude the employment

Westlaw.

relationship at any time for any reason." The Stock Option Plan referenced in the written offer of employment also made clear that it should not be understood as a promise of continued employment. In the first sentence of paragraph 9, it declared:

> Nothing contained in the Plan or this Agreement shall be construed or deemed by any person under any circumstances to bind the Company to continue the employment of the Employee for the period within which this Option may be exercised, nor shall the Plan or this Agreement create any duty of the Company or any of its affiliates or other shareholders to the Employee, comparable to the duties which partners or joint venturers may owe to each other.

***9** Even if Corley indeed told Montlouis before he accepted Pirus's offer of employment that he would be employed by Pirus for at least four years and would receive equity in Pirus under its 2000 Stock Option Plan, which provided for a four-year vesting period for those options, these oral statements, even if they were understood by Montlouis to be promises rather than predictions, were superseded by the written employment agreement and the Stock Option Plan, would made explicit that Pirus was making no promise of continued employment. Moreover, any oral promise of employment for a four-year period would be unenforceable because of the statute of frauds. See G.L.c. 259, § 1; *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 110 (1st Cir.1991).

Nor can Montlouis reasonably make any claim of reliance based on Corley's statements, because his reliance plainly was unreasonable if he read the one-page offer letter that made clear he was to be an at-will employee with no promise of any term of employment. See generally *Marram v. Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 59 (2004) (plaintiff's reliance on oral statements may be unreasonable as a matter of law in light of contrary written statements).

Montlouis' claim based on the implied covenant of good faith and fair dealing fares no better. The damages that may be awarded to an at-will employee for breach of the implied covenant of good faith and fair dealing are limited to unjust enrichment damages--the amount required to prevent an employer from being unjustly enriched by depriving an employee of money that he had fairly earned and legitimately expected. *King v. Driscoll,* 424 Mass. 1, 12 (1996); *Kravetz v. Merchants Distribs., Inc.*, 387 Mass. 457, 463 (1982). Montlouis had not yet fairly earned his stock options, because under the Stock Option Plan an employee vested only after four years of employment. Nor could he have any legitimate expectation of obtaining those stock options until he had worked at Pirus for four years in view of the express language of the Plan.

Therefore, Pirus is entitled to summary judgment on Montlouis' claims that he was promised a four-year employment term and the right to vest in the Stock Option Plan, whether that claim be based in contract, reliance, or the implied covenant of good faith and fair dealing.

*ORDER*

For the reasons detailed above, this Court *ORDERS* that defendants' motion for summary judgment is *ALLOWED* as to all of plaintiff's claims. Judgment shall enter for the defendants, with statutory costs.

Not Reported in N.E.2d, 19 Mass.L.Rptr. 277, 2005 WL 1009523 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

Page 1

Not Reported in N.E.2d
Not Reported in N.E.2d, 2000 WL 1273868 (Mass.Super.)
**(Cite as: 2000 WL 1273868 (Mass.Super.))**

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
**Katherine P. FARRINGTON,**
**v.**
**Douglas J. DeANGELIS et al.**
**No. CA994277.**

April 14, 2000.

MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SOSMAN

***1** Defendants have moved to dismiss certain claims brought by plaintiff. The motion is allowed in part and denied in part as follows.

I. Misrepresentation

Plaintiff complains that, at the time she was offered a job at defendant Lynx Systems Developers, Inc., she was promised that she would receive a 1% equity interest in lieu of $10,000 in her first year salary. She never received the promised stock, and she contends that Lynx never intended to give her the stock. The mere fact that a party fails to honor a promise is not sufficient to show fraud or misrepresentation. However, the claim that, at the time the promise was made, the promisor already had no intent to keep that promise does make out a claim of misrepresentation. That claim is pled with sufficient particularity in the complaint.

II. G.L. c. 93A

Plaintiff's claims against defendants all stem from her employment relationship with Lynx, which would take her claims outside G.L.c. 93A. Plaintiff argues that, with respect to the alleged fraud at the time she was hired, that fraud occurred prior to the actual date of commencement of her employment and that that aspect of her claim can therefore be brought within G.L.c. 93A. Case law holding that claims arising from the employment relationship are not actionable under G.L. c. 93A "impose[ ] no limitation that the employment relationship be ongoing." *Informix, Inc. v. Rennell,* 41 Mass.App.Ct. 161, 163 (1996). "The appropriate inquiry for a [G.L. c. 93A] Section 11 claim is not when the alleged misconduct took place but whether, '[t]aken as a whole, the allegations ... may not be characterized fairly as arising out of an employment contract.' " *Sargent v. Tenaska, Inc.,* 914 F.Sup. 722, 731 (D.Mass.1996), *affirmed,* 108 F.3d 5 (1st Cir.1997). The employee's argument presented in *Sargent* is identical to that presented by plaintiff Farrington. Failure to pay an employee his or her promised compensation does not become a G.L. c. 93A claim based on the allegation that the promise was made prior to the commencement of employment. Such a dispute clearly arises out of the employment contract and is therefore not within the purview of G.L. c. 93A.

Plaintiff also argues that, because her employment compensation included the promise of stock, the claim comes within G.L. c. 93A because that statute covers the offering for sale of any "security." G.L. c. 93A, § 1(b). The fact that an employee's compensation includes stock or stock options does not serve to avoid established jurisprudence holding that disputes arising out of the employment relationship are not covered under G.L. c. 93A. Indeed, under plaintiff's theory, employment relationships that included any of the other items listed in the § 1(b) definition of "trade" or "commerce" (a definition that includes the "sale" or "distribution" of "any services" or "any property", tangible or intangible, real, personal or mixed) would become subject to G.L. c. 93A. For example, an employee's dispute with his employer about being provided with a company car does not come within G.L. c. 93A simply because the claim involves the employer's "distribution" of an item of "property." The reference to sale or distribution of any "security" as set forth in § 1(b) is no different from that section's reference to sale or distribution of "property." The dispute about stock in this case arises from the employment relationship, and that dispute is therefore not actionable under G.L. c. 93A.

III. Intentional or negligent infliction of emotional distress

***2** Plaintiff acknowledges that her claim against Lynx for infliction of emotional distress is barred by the exclusivity provisions of the workers' compensation act. She contends, however, that she may pursue such a claim against the individual

EXHIBIT
tabbies
I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw



defendant, Douglas DeAngelis, the supervisor who allegedly perpetrated this tort. The issue whether DeAngelis' alleged conduct did or did not arise within the course of his employment is not one that can be determined on a motion to dismiss. The denial of this motion to dismiss as to the emotional distress claims made against DeAngelis is without prejudice to a later motion for summary judgment on the issue of whether DeAngelis' actions were taken within the scope of his own employment duties at Lynx.

IV. G.L. c. 110A, § 410

Based on her claim that Lynx and DeAngelis did not intend to honor the promise of stock and that the company ultimately did not honor its promise to compensate her with stock, plaintiff seeks to bring a claim under G.L. c. 110A, § 410(a)(2). The statute imposes liability for offering or selling stock "by means of any untrue statement of a material fact or any omission to state a material fact necessary, in order to make the statements made, and in light of the circumstances under which they are made, not misleading." *Id.*

Here, plaintiff is not complaining that she was, by way of any form of misrepresentation, induced to buy stock that she now regrets buying. To the contrary, she seeks in her complaint to enforce the alleged promise to transfer the stock to her. In this case, the sale or offer was not made "by means of" any m isrepresentation--*e.g.*, by misrepresentations about the worth of the company or about its prospects. Rather, the offer to compensate plaintiff by way of stock was accepted by her (thus forming an alleged contract), and plaintiff's complaint is simply that that alleged contract was then breached. The added claim that defendants never intended to honor that contract (which makes out a case of fraud) does not bring the claim within § 410(a)(2). "The scheme of c. 110A, geared primarily to protecting securities buyers from fraudulent representations, probably offers no remedy to one whose chief complaint is nondelivery of shares promised." *Schinkel v. Maxi Holding, Inc.*, 30 Mass.App.Ct. 41, 49 (1991).

ORDER

For the foregoing reasons, Defendants' Motion to Dismiss is ALLOWED in part and DENIED in part as follows:

(a) the motion is allowed as to plaintiff's claims for violation of G.L. c. 93A;

(b) the motion is allowed as to plaintiff's claims for violation of G.L. c. 110A, § 410;

(c) the motion is allowed as to plaintiff's claims against defendant Lynx Systems Developers, Inc. for infliction of emotional distress;

(d) the motion is denied as to plaintiff's claims against defendant Douglas DeAngelis for infliction of emotional distress; and

(e) the motion is denied as to plaintiff's claims for fraud and misrepresentation.

Not Reported in N.E.2d, 2000 WL 1273868 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



EXHIBIT
Aretakis
21
9-23-05 EV
PENGAD 800-631-6989

**Date:** 7/7/98
**Sender:** BOB COACKLEY
**To:** Eve Aretakis
**cc:** BILL VONREICHBAUER
**Priority:** Normal
**Subject:** Re:newco situation

Eve

In partial reply to your note of today, I note your comments on the postponement of the staff meeting, however the shift is only one of 6 days to 7/13. I hope you are planning to attend and maybe we can cover some of your concerns in more detail at that time.

Let me at least try to deal with some of the pressing issues that you raise:-

1) There are no plans or discussions relating to any potential sale of GS Networks, that I am aware of. I have consistently reminded staff that this is not an attractive option for GSX or for any likely acquirer because of the low tax basis we have for our company and the consequent high tax penalty that an acquisition would attract. There are however no change-in-control provisions for yourself or your colleagues, in respect of a direct sale of the company (GS Networks), nor are there such provisions in respect of a change in control relating to GSX.

2) The spin date was delayed as you already know, because the GSX Board was concerned that Q1 results showed a decline when compared with Q1/97. The BOD decided to await publication of Q2 results and required that these show earnings growth over Q2/97 and over q1/98. We have achieved these results. Timing for the spin now revolves around publication of GSX Q2 results (probably 7/17) and then submission of supplementary info to the SEC including these results and allowing time for the SEC to seek any answers to questions they may have. (Note that we are just now responding to SEC questions from the prelim version of Form 10). We also still do not have the IRS ruling which is a mandatory requirement for the spin. There can be no definitive date for the spin until the GSX BOD votes on the issuance of the dividend (of Newco shares). My estimate is that the BOD will vote end July or early August after which will be the "date of record" for shareholders who are entitled to a dividend issuance of Newco shares. This could be in the week of 8/10 and would then require a 10 day interval to the Distribution Date (Spin Date), leading to an end August likely spin date. At the same time GSX is motivated to avoid the week of Labor Day because of difficulties in getting attention from market makers, who we want at the road show. In summary, I'm guessing at the end August as most likely, but there are NO ASSURANCES until the BOD votes.

3) As far as I am concerned, there has been minimal change in the GM role. I have continued to sign off on employment offers, partly as a control measure, and partly as an information communication tool, because I find that GMs are not communicating as closely as I would like. In your case, this is also true and I have instituted the site reviews to try to remedy this communication issue. At the same time, I feel strongly that you have tremendous scope and authority with minimal intrusion. The GM role is a meaningful role that carries authority commensurate with the responsibilities and you have the scope to meet the goals that have been set for you. I think there is more to discuss here and this is better done face to face as part of your annual review. Please suggest dates when you would like to meet for this review.

4) Nothing on this topic is changed. I had already set in place a strategy for Westford that would move toward loop equipment and away from T/M, before you joined and I am still committed to this plan. In regard to a likely acquisition or investment that would accelerate this plan, you and I put a date of Q2/99 for such in the Business Plan. You should continue to work toward these goals.

5) The Form 10 does not require statements on compensation for all Executive Team members post spin. I am at present working on your statement of compensation up to spin date and will send you a note on this shortly. Basically, your base will continue at its present level and you will receive bonuses based on YTD budget at end July (IF SPIN OCCURS IN AUGUST). Note that

EXHIBIT
J
tabbies