UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| EVANTHIA C. ARETAKIS and<br>CHARLES F. SVIRK, JR.,<br><br>     Plaintiffs,<br><br> -v.-<br><br>INRANGE TECHNOLOGY CORP.,<br><br>     Defendants. | )<br>)<br>)<br>)<br>) Civil Action No.<br>) 05-10257-DPW<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT IN OPPOSITION TO SUMMARY JUDGMENT MOTION

I, Evanthia C. Aretakis, hereby depose and state under oath as follows:

1. That I am, along with my husband, Charles F. Svirk, Jr. the Plaintiff in the above entitled matter, and I make this Affidavit in Opposition to Defendants' Motion for Summary Judgment.

2. As a threshold matter, the Defendants' Motion is made only after my completed deposition. My attorney has not yet taken the testimony of the Defendants, including primarily Robert Coackley, the former president of General Signal Networks, Inc., who made the relevant agreement and contracts with me. The Defendants are also aware of Jayne Fitzgerald, a non-party witness who will corroborate my claims as the same set of commitments were made and breached to her.

3. It is my understanding from personal knowledge that if and when Mr. Coackley testifies or provides sworn testimony in this case, that he will agree with my statements and allegations regarding the Defendants' breach of contract and my detrimental reliance, claims of fraud, promissory estoppel and other claims in this case.

Regardless, the Defendants' Motion should respectfully be denied due to my Complaint, this Affidavit and the accompanying exhibits and materials submitted by the Parties.

4. It is interesting to note that the Defendants have not attached my Complaint as an exhibit to the Motion.

5. The Defendants attempt to rely on my answers on page 66 as indicative that the two Letter Agreements (Defendants' Exhibit "B" and "C") <u>were the sum total</u> of the contractual obligations the Defendants made with me, but this is and was not the case and can be seen upon closer inspection (emphasis added). The attached memorandum of law demonstrates that what has been described to me as parole evidence is needed in this case, as the Defendants themselves rely on parole evidence.

6. Mr. Conley's question to me on page 66 of my deposition says specifically "other than the two offer letters that were just looked at, there's <u>nothing else that you received</u> from Mr. Coackley or Mr. von Reichbauer or GSN that you believe sets forth the terms of your employment with the Company, right?" (Emphasis added.)

7. This answer I gave is consistent with the oral contract that Mr. Coackley made with me, and that is the basis of this suit. The reason is Mr. Coackley made oral representations that were outside of, in addition to and consistent with Defendants' Exhibit "B" and "C."

8. During my negotiations with Mr. Coackley prior to June 6, 1997, Mr. Coackley promised me that along with issues set out in Defendants' Exhibit "B" and "C", that I would receive and obtain the stock referred to in the Complaint.

9. After detailed conversations on this point on June 9, 1997, these same commitments were made to me and confirmed to me. During my time with the

Defendants', spanning over one year, these same commitments were made and reconfirmed to me as well as other agreements associated with the relocations.

10. The Defendants would have this Court believe that the June 6, 1997 (Defendants' Exhibit "B"), and the June 10, 1997 (Defendants' Exhibit "C") are the sum total and complete contractual terms that Mr. Coackley or the Company made with me. A very close reading and inspection of these two documents demonstrates that outside evidence and information commonly referred to as parole evidence is appropriately reviewed to better see each of the parties' intent. The Defendant movants' own analysis utilizes parole evidence to make Defendants' Exhibit "C" part of the agreement of the parties.

11. Despite what is stated in the Defendants' Memorandum of Law, there is no integration clause in either of the letters. This means that the two letters were not and were never made to entail the sum total of the agreement between the parties. This was never my intent nor Mr. Coackley's intent. The stock I was promised was specifically promised and set out, but was explained could not be legally placed in the contract, and the Defendants do not ever refute this point.

12. The only reason I left my twelve-year career and my position at Siemens to work for the Defendant GSN is the Defendants' promise and commitment to obtain stock options. I went from Siemens where I ran a $500 Million Dollar unit to GSN where I ran a $60 Million Dollar unit because of the agreement for an equity state. I left a $200,000.00 year end bonus from Siemens on the table when I left in June 1997. I would have realized the $200,000.00 bonus in September 1997 or only three months later. Defendant Coackley indicated he could not wait until September 1997 because the use of my name was

3

important as an established leader in the telecom and data networking area. Defendant Coackley knew that the only way for me to be interested in leaving an established career at Siemens, moving across the country, and running a $60 Million Dollar unit instead of a $500 Million Dollar unit was for a guaranteed equity position. The oral contract I made with him was specific as to this point. My employment at Siemens did not entail an equity stake in my Company and I clearly relied on Mr. Coackley's representations in this regard to change where I lived, and how I would be rewarded for adding substantial value and credibility to the Defendants. The Defendants have not argued that Mr. Coackley was without authority to make these commitments to me and Jane Fitzgerald. Out of hundreds of Bates stamped documents or exhibits exchanged back and forth during my thirteen months (exchanged during discovery) all of the correspondence and e-mail were consistent with my claims in this case.

13. With respect to parole evidence, or evidence outside the documents of Defendants' Exhibit "B" and Defendants' Exhibit "C", the letters drafted by the Defendants indicate that material outside of these letters are needed to review the agreements made.

14. In the Defendants' own Exhibit "B", the letter talks of a comprehensive benefits program that is available. "A brief summary of our programs is attached." Yet the Defendant attached no such summary to their Motion and such a program is needed to see the scope and term of this issue and which demonstrates that parole evidence or material outside the alleged contract is and was needed to give a clearer and more accurate picture of the terms of the agreement.

15. The Defendants' Exhibit "B" also states that "additional information regarding our benefit programs and effective dates will be provided at your orientation meeting which will be scheduled when you join the Company." (See Defendants' Exhibit "B.")

16. The offer was also made subject to the results of medical and other drug screen examinations. The Defendants' letter then follows with "Instructions and related information are enclosed." This was also not attached to the Motion and is additionally indicative that one has to go beyond the four corners of Defendants' Exhibit "B" and "C".

17. The Defendants' Exhibit "B" also states "The <u>enclosed</u> Employee Confidentiality and Invention Agreement and Conflict of Interest Questionnaire. These documents require your review and signature." This is further evidence that the Defendants supposedly included this additional document that is not attached as being part of the parties' agreement. Since parole evidence is necessary to review what the Defendants say is the Employee Confidentiality and Invention Agreement, as well as the Conflict of Interest document, it is obvious that the Defendants' Exhibit "B" and "C" are not the sum total of the Defendants' obligations to me.

18. Going on to the Defendants' Exhibit "C", the Defendants concede that in addition to Exhibit "B", there were conversations on at least June 9, 1997 concerning the terms of the parties' agreement. The June 10, 1997 letter was to be seen as an addendum to the June 6, 1997 letter, and as such the Defendants concede that parole evidence is warranted in this case, because I only signed the June 6, 1997 letter (Exhibit "B") on June 12, 1997.

19. Although the Defendants' Exhibits "B" and "C" are the only two offer letters that I received, they do not comprise the entirety of the agreement and contract that I had with Mr. Coackley regarding my relationship with GSN. At my deposition I was advised to only answer the question posed to me.

20. Defendants' Exhibit "D" confirms and is consistent that I was alleging the Defendant had made the commitments I have alleged in the Complaint. My letter of February 9, 1998 states specifically "For me, as I mentioned above, the promise of compensation in equity of GSN was an essential inducement to GSN. There is no substitute for genuine equity stake." (Defendants' Exhibit "D"). This same letter concludes that detrimental reliance exists when I stated: "I left Siemens primarily for the GSN stock options that I anticipate receiving and the visibility they will confer on GSN."

21. On page 9 of Defendants' Memorandum of Law, the Defendants argue that "Her employment contract was fully integrated, final expression of the parties' agreement, thus barring any prior oral or contemporaneous agreements that serve to vary the terms of the written agreement." As I have demonstrated, any contract was not integrated and the written document I signed (Exhibit "B") does not even reference a subsequent document (Exhibit "C") that the Defendants argue is a part of the total agreement, but is not signed by me. As such, the Defendants' own arguments require parole evidence. Without parole evidence, the Defendants are not even able to have this Court review Defendants' Exhibit "C", which the Defendants concede is another part of the agreement between the parties.

22.  I signed the document of June 12, 1997, Defendants' Exhibit "B", but this did not in any way represent the entirety of my agreement with the Defendants. The Defendants even apparently concede that Exhibit "C" was part of my deal with the Defendants and Exhibit "C" (drafted four days after Exhibit "B") is not signed, nor is it referenced in Exhibit "B".

23.  Had any written documents stated that the stock <u>was not</u> a party of my contract, I would not have signed anything because the stock was an essential part of my contract. I was told that it just was not legal to put the reference to the stock in the contract and I believed that statement.

24.  Had any written document contained what I now know to be called an integration clause that is any reference to oral parts of my contract are specifically excluded from my deal, I also would not have signed any documents.

25.  I am not a lawyer and have never received any legal training. I have never before engaged in conversations about stock or securities, so I was unfamiliar with, and relied on Mr. Coackley and Mr. von Reichbauer's statement that there was a legal preclusion preventing the reference to stock in any formalized writing. But, I need to reiterate that the reason I was joining a start up was because my twelve year career at Siemens did not include an equity interest.

26.  My husband had a thriving real estate company in Boca Raton, Florida in 1997, and my children were in pre-school and first grade in Florida where they lived their entire lives. I picked up my entire family and made the move to the Defendants' company, not for a TEN PERCENT (10%) raise in salary, but because I was being given an equity state in the company.

7

27. The Defendants do not seem to be denying that these promises were not made, and part of my deal. Although I believe they have control over Mr. von Reichbauer and/or Mr. Coackley, the absence of an affidavit from these persons is significant.

28. I know that the Defendants have breached their oral contract with me, and as well I relied to my detriment on their promises. If Mr. Coackley made these promises that were false, and that he knew to be false at the time he made them, then the Defendants are also liable for fraud and/or fraudulent misrepresentations.

29. During discovery and during my depositions, I provided the Defendants with notes from my tenure at the Defendants' company. These notes were consistent with, and advance the same premise that I joined the company for, and am now in litigation over, which is the promised stock.

30. I also had continuing conversations with the company that repeatedly confirmed and reaffirmed the commitments made to me. I also worked for the company in excess of one year, until I resigned because of the Defendant's breach. The cases cited by the Defendants are cases where employees were fired or claimed a hostile work environment. I commenced this action, and I left the company both for the same reason, that the Defendants breached their contractual obligations and committed other claims for which they bear responsibility.

31. The Defendants' papers go to great lengths to claim without the benefit of any expert or other witness that my reliance on the promises of Mr. Coackley was unreasonable. My reliance was reasonable and logical to me.

32. In hindsight, it appears as if the Defendants lured me and others into their company in order to position the company for a sale. If this is true, then it seems the Defendants' breach of their agreement was also fraudulent because they only wanted to make the company look more credible and attractive in order to maximize a sale of the company. I respectfully submit that this type of behavior should not be countenanced by our Courts. The disruption and shakeup in my family's lives was substantial, and the Defendants do not even rebut that this deal was made with me. They also do not make this Motion with affidavits from persons with knowledge.

33. We expect to call as a non-party witness to corroborate my claims another female employee of GSN named Jayne Fitzgerald.

34. This Jayne Fitzgerald was also promised the same things that I was promised. This woman, who also worked and contracted with the Defendants, had promises which were also breached, and she has also claimed the Defendants made misrepresentations to her about the stock which she relied on.

35. During my depositions, I was repeatedly asked about her, and we advised the Defendants that her testimony would be taken and would corroborate my claims. The Defendants are believed to have stopped short of taking her testimony, or have made this Motion prior to my attorney taking her deposition because she would offer additional documentation and testimonial evidence of the Defendants' breach and misrepresentations we relied upon. Jayne Fitzgerald was referred to by me or my attorney at my deposition as someone who would be providing testimony to corroborate my claims in this case. Despite being damaged in a similar manner to me,

on information and belief Jane Fitzgerald decided not to similarly file a lawsuit after possibly reaching an agreement of some sort with the Defendants.

36. Because of my travel schedule, and due to other constraints, we were not able to seek an Affidavit from Ms. Fitzgerald to supplement this opposition.

37. The Defendants also failed to submit any Affidavit or statements from Mr. Coakley, which seems like an admission that he would not contradict my claims and the promises he made and breached.

38. Out of hundreds of Bates stamped documents or exhibits exchanged back and forth during my thirteen months (exchanged during discovery) all of the correspondence and e-mail were consistent with my claims in this case.

I HEREBY SWEAR TO THE ABOVE UNDER THE PAINS AND PENALTY OF PERJURY this 27th DAY OF FEBRUARY, 2005.

  /s/ Evanthia C. Aritakis  
EVANTHIA C. ARETAKIS