UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
EVANTHIA C. ARETAKIS, and          )
CHARLES F. SVIRK, JR.,             )
         Plaintiffs,               )
                                   )
                                   )    CIVIL ACTION NO.
      v.                           )    05-10257-DPW
                                   )
GENERAL SIGNAL, INC.,              )
GENERAL SIGNAL NETWORKS, INC.,     )
SPX CORP.,                         )
INRANGE TECHNOLOGIES CORP.,        )
ROBERT COACKLEY,                   )
"JOHN DOE" AND                     )
"JANE DOE,"                        )
         Defendants.               )
```

MEMORANDUM AND ORDER
June 7, 2006

Plaintiffs, Evanthia Aretakis and her husband Charles Svirk, have brought four claims against Defendant General Signal Networks, Inc. ("GSN"), formally a subsidiary of General Signal, Inc. ("General Signal") and the predecessor of Defendant Inrange Technologies ("Inrange"), relating generally to a promise that Aretakis would receive stock option equity in an anticipated "spin-off" of GSN from General Signal if she joined GSN's management team.[1] Defendant Inrange has moved for summary judgment on all counts.

**I. SUMMARY JUDGMENT**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] Plaintiff also brought these claims against SPX Corporation, Robert Coackley, John Doe, and Jane Doe, but Plaintiffs stipulated dismissal against these parties.

together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Consequently, a party seeking summary judgment must make a preliminary showing, based on evidence presented as provided for by Fed. R. Civ. P. 56(e), that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995), cert. denied, 515 U.S. 1103 (1995).

Once the movant makes the requisite preliminary showing, the non-movant must point to specific facts demonstrating that there is, indeed, a trialworthy issue. Id. Consequently, to oppose a motion for summary judgment successfully, the non-moving party must present evidence with "substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial." LeBlanc, 6 F.3d 836, 841-42 (1st Cir. 1993)(internal citations omitted). Even if the non-moving party presents little or no evidence in opposition, "[t]he court must first inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law" before granting summary judgment. De La Vega v. San Juan Star, Inc., 377 F.3d 111, 115 (1st Cir. 2004) quoting Jaroma v. Massey, 873 F.2d 17, 20 (1st Cir. 1989).

Local Rule 56.1 specifies that:

> Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to

affidavits, depositions and other documentation.... Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation.... Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

Here, Inrange included a Statement of Undisputed Facts with its Memorandum in Support of Motion fo Summary Judgment. Most of the material facts set out in the Statement are supported with page references to the deposition of Aretakis and other documentation as required by L.R. 56.1. However, many of the details of the events described after Aretakis began working at GSN rely solely on the Complaint for support. In opposing summary judgment, Plaintiffs did not object to this use of their Complaint -- in fact, Plaintiffs also cite to their Complaint to support their Preliminary Statement and other factual assertions in their Opposition -- and they have failed to submit a statement of the material facts of record as to which they contend there exists a genuine issue to be tried, as required by L.R. 56.1. Since "[a] party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding," Schott Motorcycle Supply, Inc. v. American Honda Motor Co., 976 F.2d 58, 61 (1st Cir. 1992) quoting Bellefonte Re Insurance Co. v. Argonaut Insurance Co., 757 F.2d 523, 528 (2nd Cir. 1985), I will consider as admitted the undisputed assertions

in the Complaint as well as the contentions in Inrange's Statement of Undisputed Facts for purposes of this motion unless I find them explicitly controverted by evidence in the record before me.[2]

## II. BACKGROUND

Aretakis began her professional career in 1981 and worked for various companies in Texas, Massachusetts, and New York before transferring to a position with Siemens Corporation in Boca Raton, Florida in 1988.  By 1997, Siemens had promoted Aretakis to vice president of a $500 million business unit. Aretakis voluntarily resigned from that position in June 1997 to join GSN,[3] giving up a $200,000 year end bonus from Siemens that she expected to realize in September 1997.

Aretakis first learned of the opportunity at GSN in December 1996 or January 1997.  A recruiter from the recruiting firm of Christian & Timbers contacted Aretakis and told her that GSN was looking for a general manager for one of its business units in

_____

[2]  Plaintiffs have suggested that summary judgment is inappropriate here since only the deposition of Evanthia Aretakis has been taken.  I disagree.  Plaintiffs consented to Inrange filing a motion for summary judgment at this stage and they did not file a motion under Fed. R. Civ. P. 56(f) requesting summary judgment be continued to permit the deposition of Robert Coackley or other individuals involved.  In any event, Aretakis's deposition provides sufficient factual development to resolve the legal issues raised in this summary judgment motion.

[3] Defendant Inrange represents that in the relevant period of 1997-1998, GSN was a wholly-owned subsidiary of General Signal Holdings Company, which in turn was a wholly-owned subsidiary of General Signal Corporation.

Massachusetts.  The recruiter indicated that GSN was looking for someone who could accomplish three things: develop a breakout strategy, provide leadership to a team that would be part of a spin-off of GSN from General Signal, and use well-established contacts in the telecommunications industry.  The pre-hire discussions with the search firm progressed, and Aretakis began corresponding directly with Robert Coackley, then-president of GSN, and William von Reichbauer, who Inrange represents was vice-president of Human Resources at the time.  Aretakis also spoke with Michael Lockhart, then CEO of General Signal, very briefly.

Over the course of several conversations in early 1997, including at least two face-to-face meetings, Coackley and Aretakis discussed the opportunity at GSN, the planned spin-off, and Coackley's plan that the top eight members of the GSN management team would each acquire five-eighths of one percent (1%) of the equity in the spin-off company.  Coackley told Aretakis that he expected the business unit would be spun-off before the end of the summer of 1997.  Recognizing that Aretakis was concerned about securing equity in a company, Coackley told her that he believed joining GSN would be far less risky than joining a start-up.  Prior to being hired, Aretakis understood that she would acquire equity in the spin-off company only after both the divestiture from General Signal and the IPO were complete.  Aretakis was also aware that effecting the spin-off

would require approval by the General Signal Board of Directors and the IRS, although she did not, until later, understand the specific issues and what still needed to be resolved.

Aretakis understood that Coackley's plan would result in a grant of roughly 125,000 shares to each of the eight senior management members of GSN.  Coackley explained that this equity would take the form of stock options that would vest over a four year period from the inception of the spin-off.  Coackley told Aretakis that the share price after the IPO issued might be roughly $20, and that the price at which the eight officers would be permitted to purchase shares would be in the neighborhood of $10.  Aretakis understood that Coackley's valuation was a conservative estimate based on the business unit's current revenue and profitability.

Other than her conversations with Coackley and von Reichbauer, Aretakis did not inquire further about the spin-off with anyone else who was affiliated with GSN or General Signal prior to joining GSN.  In particular, she did not raise the issue with Lockhart during the interview with him.

GSN presented Aretakis with a written offer of employment on June 6, 1997.  The offer contemplated that GSN would pay Aretakis $175,000 annually, and that she would receive a hiring bonus of $40,000.  The offer also contained two additional bonus opportunities: twenty-five percent (25%) of Aretakis's base

salary if GSN met its performance targets, and an incentive bonus based on operating income for the unit she would manage.  The offer also included 1,000 stock options in GSN's parent company, General Signal, eligibility for the GSN long-term incentive program, and other benefits.  The offer letter made no mention of Coackley's promise that she would receive five-eighths of one percent of the equity when the GSN spin-off was completed.

The June 6th offer letter included a paragraph stating: "You or the Company may terminate your employment, with or without cause at any time."  Aretakis understood that this meant the offer was for "at-will" employment.

After receiving the June 6th offer letter, Aretakis spoke with von Reichbauer to clarify a few points.  As a result, GSN issued an addendum to the June 6th offer on June 10, 1997.  The addendum included a $10,000 relocation allowance, additional vacation eligibility, and specific arrangements and exceptions to GSN's standard relocation policy.  The addendum also made no mention of any stock options in a potential spin-off of GSN.

The lack of reference in writing to any equity in the planned spin-off concerned Aretakis, but Coackley and von Reichbauer reassured her that it was missing only because they legally could not put that incentive in writing at that time.

Aretakis signed the June 6th offer letter on June 12, 1997. Other than the June 6th and June 10th letters, Aretakis did not receive any other written document setting forth the terms of her

employment from Coackley, von Reichbauer, or anyone else on
behalf of GSN before she joined GSN.

Aretakis began her employment with GSN in July 1997.
Although it became obvious to Aretakis that the original forecast
of an August 1997 spin-off date could not be achieved,  GSN
continued to work towards the spin-off throughout her tenure at
the Company.  For example, the 1998 budgeting assumptions
discussed between July and September 1997 included costs related
to the spin-off.  Similarly, the "1998 Corporate Vision,"
prepared in December 1997, confirmed that GSN was working towards
the spin-off.  An article about the impending spin-off appeared
in the Philadelphia Business Journal on December 19, 1997.  In
February 1998, the official application for Internal Revenue
Service approval was formally released indicating that the GSN
spin was "in play."  Later, after Coackley indicated that gain in
the second quarter of 1998 would be required to achieve the spin-
off, a new date of July 1998 was set.

As the process appeared to move forward, Coackley re-
affirmed that Aretakis would receive an equity interest once the
spin-off was completed.  However, in meetings on February 18 and
19, 1998, Aretakis realized that a new formulation of stock
issuance for executives had been created.  Coackley subsequently
indicated in meetings on March 25, 1998 and April 23, 1998 that
the stock distribution presented in February would be improved,
but would not be consistent with his original representations.

-8-

When the July 1998 date was set, Coackley again described the stock distribution that would take effect.

On July 6, 1998, the Network News, an internal newspaper signed by Coackley, stated that "[a]lthough we have been working toward a July 1 spin date, we decided to delay the date approximately a month so that second quarter results will be available."  The next day, Aretakis wrote to Coackley requesting written confirmation that the spin is still on target with a "not to exceed" date and clarification of compensation and stock. Coackley's response indicated that he would not provide a commitment to no further delays and that there were no assurances on the date of the spin until the Board of Director's voted.

In July 1998, General Signal publicly announced it had received an offer from SPX to sell its GSN subsidiary, and all plans for the spin-off were put on hold.  Aretakis had voluntarily resigned a few days prior to the public announcement of the sale to SPX.  GSN's name was thereafter changed to Inrange and then spun-off more than two years later in September 2000.[4]

### III. DISCUSSION

---

[4]  Earlier litigation by the parties in the Southern district of New York over Aretakis's employment relationship was dismissed without prejudice in 1999.  However, the statute of limitation with respect to the claims was waived indefinitely permitting the filing of this case some six years later without consideration of statute of limitation constraints.

Plaintiffs[5] seek redress for breach of contract (Count I), promissory estoppel (Count II), deceptive practices contrary to Chapter 93A of the Massachusetts General Laws (Count III), and fraud (Count IV).  Defendant Inrange has moved for summary judgment on all counts.

**A. Breach of Contract**

The parties agree that Massachusetts law governs the interpretation of their employment compensation agreement. Inrange argues that even if Coackley held out the prospect that Aretakis could receive five-eighths of one percent (1%) of the equity in the anticipated spin-off of GSN as an inducement to get her to join GSN, that promise is unenforceable for several reasons.  I find it necessary only to address two of these reasons; first -- the reason most fully argued -- that the June 6th and June 10th offer letters together amount to a fully-integrated employment contract that supercedes any earlier promise of equity, which I reject; and second, that Coackley's oral promise was too indefinite to enforce, which I accept.

1. <u>Integration</u>

Under Massachusetts law, "the question of integration is one

---

[5]  The parties agree that any claims of the Plaintiff Charles F. Svirk, Jr., Aretakis's husband, are contingent upon the success of the claims of Aretakis herself and that if her claims do not succeed neither, necessarily, will his.  The Svirk claims have not been argued separately in this summary judgment motion.  Nevertheless, I will refer to Plaintiffs in the plural because the summary judgment motion is directed  at disposing of the case in its entirety by challenging Aretakis's claims.

of fact reserved for the trial judge[.]" <u>Cambridgeport Sav. Bank</u>
<u>v. Boersner</u>, 413 Mass. 432, 436 n. 7 (1992); <u>see</u> <u>also</u> Restatement
(Second) of Contracts § 209(2); 210(3).  Generally, an agreement
reduced to writing is an integrated agreement if, in view of its
completeness and specificity, it reasonably appears to be a
complete agreement, unless contrary evidence establishes that the
writing did not constitute a final expression.  <u>Robert</u>
<u>Industries, Inc. v. Spence</u>, 362 Mass. 751, 754 (1973);
Restatement (Second) of Contracts, § 209(3).  Massachusetts "has
adopted the position of Restatement (Second) of Contracts § 214
(1981) that evidence of the contract negotiations and the
circumstances of its execution are always admissible to show
whether the contract was intended by the parties as an integrated
(i.e. final) expression of the terms of their agreement."  <u>Fred</u>
<u>S. James & Co. of New England, Inc. v. Hoffmann</u>, 24 Mass.App.Ct.
160, 163 (1987).

     Here, the signed June 6th offer letter appears on its face
to be an incomplete employment compensation agreement.  <u>Compare</u>
<u>Coll v. PB Diagnostic Systems, Inc.</u>, 50 F.3d 1115, 1123 (1st Cir.
1995)("All the relevant evidence indicates that the employment
contract was an integrated and final expression of the parties'
agreement with respect to compensation matters.  The agreement
lists Coll's base salary, his annual bonus, his severance
compensation, and a non-competition agreement.  In short, the
face of the document contains nothing that would indicate that

the parties did not intend it to be a complete and final expression of their rights and obligations.")  The June 6th letter appears only partially complete because the offer letter references relocation benefits outlined in a separate document that is not part of the record.  Moreover, evidence of the discussions among Coackley, von Reichbauer, and Aretakis about equity shares, together with the existence of an unreferenced June 10th letter, support a finding that the June 6th letter is not in fact a complete agreement.  Compare Coll, 50 F.3d at 1119 (In addition to the document appearing to be a complete expression of their agreement, "Coll admitted in his deposition that he thought at the time that the contract embodied all the material terms and conditions of his employment.")

Inrange contends that the June 6th and June 10th letters must be considered together as the integrated employment compensation agreement between GSN and Aretakis.  However, even accepting that the two letters could be read together as establishing the terms of the agreement, there is no integration clause in either letter.  More fundamentally, Inrange does not deny that Coackley promised Aretakis equity shares in a potential spin-off and I find this promise not inconsistent with any of the terms in either letter.  See Restatement (Second) of Contracts § 216(1)("Evidence of a consistent additional term is admissible to supplement an integrated agreement unless the court finds that

the agreement was completely integrated.")  Furthermore, the behavior of Coackley and von Reichbauer, both before -- in reassuring Aretakis that the letters did not reference any equity in the planned spin-off only because they legally could not put that incentive in writing at that time -- and after -- in re-affirming that Aretakis would receive an equity interest -- suggests the parties only intended the letters to be a partial integration.  See Antonellis v. Northgate Const. Corp., 362 Mass. 847, 849 (1973) ("Whether there was an integration ... was a question of the intention of the parties.")  Consequently, "[t]he agreement as to [Aretakis's future equity interest] was not of such a nature that it must be deemed merged in or excluded by [her written employment compensation] agreement."[6]  Manganaro v. DeSanctis, 351 Mass. 107, 111 (1966) adopting Restatement (First) of Contracts § 240, now Restatement (Second) of Contracts § 216(2) ("An agreement is not completely integrated if the writing omits a consistent additional agreed term which is ... (b) such a term as in the circumstances might naturally be omitted from the writing.")  Thus, I find that Inrange has failed to establish that it is entitled to summary judgment on Count I based on its integration theory.

---

[6]  In this connection, I reject Inrange's contention that the circumstances here establish what by contrast I found in Trent Partners v. Digital Equipment Corp., 120 F.Supp.2d 84, 99 (D. Mass. 1999), an integrated agreement with respect to which "any oral representations [were] superceded by the written agreement."

2. <u>Indefiniteness</u>

By contrast, I accept Inrange's argument that the conversations between Coackley and Aretakis before she accepted employment were far too indefinite to form a binding oral contract guaranteeing her equity in the anticipated spin-off company. Specifically, Inrange argues that the discussion as to two essential terms, the price at which she would be permitted to purchase shares (the strike price) and the timing of the spin-off, was too vague to make the promise of equity in the spin-off company enforceable.

An employee stock option agreement is generally subject to the same rules of construction as any ordinary contract. <u>Dixon v. Pro Image Inc.</u>, 987 P.2d 48, 56 (Utah 1999); 18A Am. Jur. 2d Corporations § 1689. Consequently, "[a]ll the essential terms ... must be sufficiently definite so that the nature and extent of the obligations of the parties can be ascertained." <u>Simons v. American Dry Ginger Ale Co.</u>, 335 Mass. 521, 523 (1957); <u>Lucey v. Hero International Corp.</u>, 361 Mass. 569, 573-74 (1972). While it is clear that "[t]he court cannot make for the parties a contract which they did not make for themselves," <u>Read v. McKeague</u>, 252 Mass. 162, 164 (1925), a contract will not be held too indefinite for enforcement purposes where there exists a reasonably certain basis for supplying the indefinite or open term. <u>See</u> <u>Silver v. Graves</u>, 210 Mass. 26, 29 (1911)(Where the only element left undetermined in a contract is price, no insuperable difficulty

-14-

arises if a reasonable price can be ascertained.)

Here, Coackley told Aretakis she would receive five-eighths of one percent of the equity in a public company he anticipated would be spun-off from General Signal by the end of the summer of 1997. Her options would vest over a four year period from the inception of the spin-off, which she understood to mean that she would have the option to buy one quarter of her five-eights of one percent at the end of each year. Coackley told Aretakis that the share price after the IPO was issued might be roughly $20, and that her strike price would be in the neighborhood of $10. Acknowledging that these were just estimates, Coackley told Aretakis that whatever the actual prices turned out to be, there would be a fairly reasonable spread between her strike price and the stock price.

Based on these facts, the relevant question is whether the uncertainty as to her strike price and the date of the spin-off and IPO means, as a matter of law, "that the parties had [only] reached the stage of 'imperfect negotiation' and not that of a completed contract." Saxon Theatre Corp. of Boston v. Sage, 347 Mass. 662, 666 (1964); see also Blair v. Cifrino, 355 Mass. 706, 709 (1969); and Bell v. B.F. Goodrich Co., 359 Mass. 763, 763 (1971) citing Restatement (Second) of Contracts § 32 (Tent. draft No. 1, April 13, 1964).[7]  I find that the uncertainty regarding

---

[7] See also Restatement (Second) of Contracts § 33:

the timing and the strike price, two essential terms, makes Coackley's purported promise of equity in the spin-off company unenforceable.

As a related but independent basis for granting summary judgment to Defendants on grounds of indefiniteness, I also note that "[i]t is a settled principle of contract law that '[a] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.'" Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992) quoting Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953). Here, Coackley and von Reichbauer specifically told Aretakis that they left the promised equity in the anticipated spin-off out of the offer letter because they legally could not put that incentive in writing at that time. This explanation establishes that Coackley did not intend his promise of future equity to be legally binding at the time and that Aretakis was aware that there were legal impediments to acknowledging the spin-off equity arrangement.

---

(1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.

(2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.

(3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

**B. Promissory Estoppel**

Plaintiffs present their promissory estoppel claim as an additional ground for enforcing the subsidiary promise.  See, e.g., Loranger Construction Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 154, aff'd, 376 Mass. 757 (1978) citing Restatement (First) of Contracts § 90 (1932); and McAndrew v. School Committee of Cambridge, 20 Mass.App.Ct. 356, 363 (1985) citing Restatement (Second) of Contracts § 90(1) (1981).  The relevant section of the current Restatement provides:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Restatement (Second) of Contracts § 90(1).  However, the Supreme Judicial Court has since clarified that:

> The term 'promissory estoppel' should not be used in deciding cases under this principle because that term 'tends to confusion' and overlooks the point that "[w]hen a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory.'"

Cataldo Ambulance Service, Inc. v. City of Chelsea, 426 Mass. 383, 386 n. 6 (1998) quoting Rhode Island Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 849 (1995).  Consequently, under Massachusetts law "an action based on reliance is equivalent to a contract action, and the party bringing such an action must prove

-17-

all the necessary elements of a contract other than
consideration." Id. at 850. As a result, Plaintiffs' promissory
estoppel claim fails for the same reasons that their breach of
contract claim fails:  the promise of equity in the anticipated
spin-off company was far too indefinite to form a binding oral
contract.

Relatedly, Inrange argues that summary judgment on Count II
is also appropriate because Aretakis's reliance on any oral
promises and pre-hire discussions regarding the potential
spin-off and the accompanying stock options was unreasonable as a
matter of law.

It is clear that recovery under the so-called promissory
estoppel theory requires "'that the party invoking it must have
reasonably relied on the alleged promise to his detriment.'"
Coll, 50 F.3d at 1124 quoting Hall v. Horizon House Microwave, 24
Mass.App.Ct. 84, 93 (1987)(emphasis in Coll). "Reliance normally
is a question for a jury. However, in some circumstances a
plaintiff's reliance on oral statements in light of contrary
written statements is unreasonable as a matter of law[, a
determination that is]... generally only made after some record
has been established on a motion for summary judgment or after a
trial." Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 59-
60 (2004)(internal citation omitted). "Where a written statement
conflicts with an oral statement, Massachusetts law assumes that

-18-

a reasonable person will investigate further." McMahon v.
Digital Equipment Corp., 162 F.3d 28, 39 (1st Cir. 1998). See,
e.g., Marram, 442 Mass. at 60 citing Trifiro v. New York Life
Ins. Co., 845 F.2d 30, 33 (1st Cir. 1988) for this proposition.
Here, Coackley's promise of equity in the anticipated spin-off
was not literally inconsistent with any of the terms in either
letter, and Coackley and von Reichbauer declined on some
unspecified legal basis to include the additional incentive in
any writing.  Considering the scope of unreasonable reliance as a
matter of law broadly, I find Aretakis's reliance unreasonable
where no "'promise' in the contractual sense had been made."
Rhode Island Hosp. Trust Nat'l Bank, 419 Mass. at 850.

     Aretakis testified in her deposition that Coackley only told
her "his expectation was this spin was going to happen before the
summer had completed."  Apart from this reference to expectations
about timing, Aretakis does not contend that Coackley told her
that the GSN spin-off was a sure thing. Rather, in representing
that he believed joining GSN would be far less risky than joining
a startup, Coackley implicitly admitted that there was still some
risk involved.  Furthermore, prior to being hired, Aretakis
understood that there were several serious contingencies
involved.  Finally, despite the uncertainty surrounding
Coackley's representations, Aretakis did not inquire further
about the spin-off with anyone affiliated with GSN or General

-19-

Signal, other than Coackley and von Reichbauer, prior to joining GSN. These facts lead inexorably to the conclusion, that as in Hall, "[g]iven the extended and persistently inconclusive nature of h[er] negotiations with [Coackley] about an over-all employment and compensation package, [Aretakis] could not have had more than a well founded hope that the stock option aspect of the deal would work out satisfactorily for h[er]. Inchoate negotiations are no better basis for reliance than for an action on the purported contract as such." 24 Mass.App.Ct. at 93-94. "In short, [Coackley's] refusal to 'firm up' the [promise of future equity] rendered any reliance on prior oral representations unreasonable," Coll, 50 F.3d at 1125, even if the promise was not literally inconsistent with the written expression of Aretakis's compensation agreement.

**C. Chapter 93A**

Plaintiffs also seek a remedy under Mass. Gen. Laws. c. 93A. Inrange argues that Plaintiffs' allegation is not actionable under Chapter 93A because the promise arises out of an "employment relationship" between the parties, which is not considered "commercial" in nature as required by the statute.

To be actionable under Chapter 93A, there must "be a commercial transaction between a person engaged in trade or commerce with another person engaged in trade or commerce."

-20-

Szalla v. Locke, 421 Mass. 448, 451 (1995).  The Supreme Judicial
Court has "limited the reach of G.L. c. 93A, § 11, to exclude
intra-enterprise disputes because they are more similar to purely
private disputes and are not 'commercial transaction[s]... in the
sense required by c. 93A.'"  Linkage Corp. v. Trustees of Boston
University, 425 Mass. 1, 23 n. 33 (1997) quoting Szalla, 421
Mass. at 452.  Consequently, "[d]isputes arising out of the
employment relationship between an employer and an employee are
not cognizable under c. 93A" because "[a]n employee and an
employer are not engaged in trade or commerce with each other."
Manning v. Zuckerman, 388 Mass. 8, 14, 15 (1983).

     Plaintiffs attempt to distinguish their case from the
Manning rule by arguing that their claims arise out of the
methods used by the Defendants to recruit Aretakis and induce her
to terminate her longstanding employment with Siemens, rather
than out of her employment with the Defendants.  I do not accept
this distinction.  In Manning, the Supreme Judicial Court clearly
stated that "the hiring and firing of employees is not part of
the company's commercial activities with regard to consumers,
competitors, or other business persons."  388 Mass. at 13
(emphasis supplied).  See also Hoffman v. Optima Systems, Inc.,
683 F.Supp. 865, 871 (D. Mass. 1988) quoting Manning, 388 Mass.
at 11 ("If the defendant committed any unfair or deceptive act
[in failing to live up to an oral employment contract negotiated
prior to plaintiff joining the defendant company], such acts

-21-

'necessarily occurred in the context of the parties' employment relationship ..., and not in an arms-length commercial transaction between distinct business entities.'") Consequently, Defendants are not liable under Chapter 93A for any unfair or deceptive practices undertaken by Coackley to induce Aretakis to join GSN.

**D. Fraud**

Plaintiffs' fraud claim is based on allegations that Coackley fraudulently induced Aretakis to join GSN by deliberately misrepresenting that the spin-off would occur in the summer of 1997 and that she would receive an equity interest in the new company.

In an action for common law fraud, "the plaintiff must prove 'that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'" Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982) quoting Barrett Assocs. v. Aronson, 346 Mass. 150, 152 (1963)(quoting Kilroy v. Barron, 326 Mass. 464, 465 (1950)). Inrange contends that it is entitled to summary judgment on the fraud count because (1) Aretakis could not have reasonably relied on Coackley's representations and (2) because Plaintiffs have failed to present any evidence that Coackley's representations to Aretakis were

-22-

knowingly false statements of material fact.

As discussed <u>supra</u> in Section II.B, Aretakis's reliance on Coackley's representations as to future equity in an anticipated spin-off was unreasonable as a matter of law. Consequently, Plaintiffs' fraud claim also cannot survive summary judgment on those grounds. But, even if I found that her reliance was reasonable, Plaintiffs have failed to present any evidence that Coackley's representations to Aretakis were knowingly false statements of material fact.

Plaintiffs contend that prior to Aretakis accepting the offer of employment with GSN, Coackley assured her that everything was in place for the spin-off to occur, that it would be complete before the end of the summer, and that the five-eighths of a percent was agreed upon. These facts, according to Plaintiffs, indicate that Coackley deliberately misrepresented the imminence of the spin-off to induce Aretakis to resign from her long-standing position with Siemens and accept a position with GSN. This argument overstates the record.

As to the spin-off timeline, there is no evidence that Coackley told her everything was in place for the spin-off to occur and Coackley did not claim there was no risk. Rather, Aretakis testified in her deposition that Coackley only told her "his <u>expectation</u> was this spin was going to happen before the summer had completed." She testified that he only "<u>felt</u> that ... they were far enough along that this spin was imminent."

-23-

(emphasis supplied)  And according to Aretakis, Coackley did not tell her that IRS approval was confirmed, just that GSN had already started the process of getting IRS approval, that "they had had a number of meetings ... and ... [he] _felt_ things were moving along."  (emphasis supplied)  There is no evidence that these imprecise and tentative assurances reflecting expectations and feelings were knowingly false.

Plaintiffs claim Coackley had to know his timetable was false because GSN and General Signal had failed to prepare necessary documents required to meet the summer 1997 spin-off schedule.  Yet, Plaintiffs' only support for these claims is in the allegations in paragraphs 20 and 24 of the Complaint alleging that "the Form 10 had not been prepared and there were no formal documents filed with the Securities Exchange Commission (SEC) on the pending spin," and that the official application for IRS approval had not been formally released until February 1998. While non-movants cannot ordinarily rest on allegations in their Complaint to oppose summary judgment, in this case Defendants have asserted in their Statement of Undisputed Facts that GSN did not file its General Registration (Form 10) with the SEC until May 13, 1998 and that GSN did not receive a favorable ruling from the IRS on its application until February 1998.  Nevertheless, even these conceded facts do not prove that Coackley made any knowingly false representations as to the spin-off imminence.  In fact, Coackley made no representations to Aretakis before she was

-24-

hired as to GSN's status with the SEC, nor is there any evidence that Coackley knew in the spring of 1997 that the relevant SEC form could not be filed earlier in the hope of completing the divestiture by the end of the summer.  Similarly, the fact that the IRS did not issue a favorable ruling until February 1998 does not mean that GSN representatives could not have begun discussions with the IRS in the spring of 1997, as Coackley told Aretakis, in the hope of completing the divestiture by the end of the summer.

In sum, Plaintiffs have failed to point to specific facts demonstrating that there is a trialworthy issue as to whether Coackley's representations of a summer spin-off were knowingly false at the time he made them.  On the contrary, the present record demonstrates that Coackley and GSN continued to pursue the spin-off after Aretakis was hired, supporting a finding that while Coackley's representations to Aretakis about a summer spin-off may have been overly optimistic, they were not knowingly false.

As to the equity distribution, there is no evidence that Coackley's representations that Aretakis would receive five-eighths of a percent of the equity in the anticipated spin-off was knowingly false.  "Under Massachusetts law, a promissory statement cannot be the basis for a claim of misrepresentation unless at the time the promise was made the promissor had no

intention of carrying it out." <u>Gerli v. G.K. Hall & Co.</u>, 851
F.2d 452, 456 (1st Cir. 1988) <u>citing</u> <u>Barrett Associates, Inc. v.
Aronson</u>, 346 Mass. 150, 152 (1963). Here, there is no evidence
that Coackley was aware that GSN did not intend to honor his
promise of equity for the management team in a spin-off company.
According to Aretakis, her management team was actually re-
assured of equity in a spin-off through at least through May and
June 1998. And absent contrary evidence, the record suggests
that Coackley and GSN intended to honor Coackley's five-eighths
of a percent until at least November 1997 when a new plan for
executives was proposed.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT summary judgment to Defendant Inrange on all counts.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE